ORIGINAL

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

BOBBY GARRISON,

     Plaintiff,

Vs.

                           CASE NUMBER
                           2:05-CV-549

MONTGOMERY COUNTY BOARD
OF EDUCATION, et al.,

     Defendants.


\* \* \* \* \* \* \* \* \* \* \* \*


     DEPOSITION OF BOBBY GARRISON, taken

pursuant to stipulation and agreement before Lisa

J. Nix, Registered Professional Reporter and

Commissioner for the State of Alabama at Large, in

the Law Offices of Hill, Hill, Carter, Franco, Cole

& Black, 425 South Perry Street, Montgomery,

Alabama on Thursday, December 1, 2005, commencing

at approximately 3:05 p.m.


     \* \* \* \* \* \* \* \* \* \* \* \*



DEFENDANT'S
EXHIBIT
1

8

1   A.   4-24-58.

2   Q.   And for the record, what's your race?

3   A.   Black.

4   Q.   Where were you born?

5   A.   Montgomery, Alabama.

6   Q.   Okay.   What's your current phone number?

7   A.   334 area code, 270-7804.

8   Q.   And where do you live right now?

9   A.   8219 Parkview Court.

10   Q.   And how long have you been on Parkview

11        Court?

12   A.   12 years.

13   Q.   Is that Parkview one word or Parkview two

14        words?

15   A.   One word.

16   Q.   Are you married now?

17   A.   Divorced.

18   Q.   How long have you been divorced?

19   A.   Five years.

20   Q.   What was your wife's name?

21   A.   Nettie Garrison.

22   Q.   I have to ask these sorts of questions --

23        I'm not trying to be nosy on purpose.

19

1   A.   Yes.

2   Q.   And according to that charge which was date

3        stamped by the EEOC on December 18, 2004,

4        you claim that you were discriminated

5        against because of your race and that you

6        were terminated for reporting that

7        discrimination; is that correct?

8   A.   Yes.

9   Q.   And this document down here indicates that

10       this is an amended charge and that the

11       original charge was filed on June 29th.  Do

12       you see that?

13  A.   Uh-huh.  (Positive response.)

14  Q.   Do you have a copy of the original charge?

15  A.   I don't.

16  Q.   Do you remember why you had to amend the

17       charge or why you wanted to amend the

18       charge?

19  A.   No.

20  Q.   Do you recall the difference between that

21       charge and whatever you initially filed

22       with the EEOC?

23  A.   I don't.

24

1   A.   Yes.

2   Q.   All right.  Let's talk about your job with

3        the Board.  How did you come to work for

4        the Board?

5   A.   I applied with the Board as a Laborer 1

6        with Donald Dotson as the director, and

7        that -- after my job from Durr had

8        expired.  And I started working with them

9        as a Laborer 1.

10  Q.   How did you know a position was open?

11  A.   Through my sister.

12  Q.   Your sister?

13  A.   Yeah.

14  Q.   Did she work for the Board as well?

15  A.   Yes.

16  Q.   And did you fill out an application?

17  A.   Yes.

18               (Defendant's Exhibits 5 and 6 were

19                marked for identification.)

20  Q.   Let me show you what I've marked as Exhibit

21       5 and Exhibit 6 which appears to be a copy

22       of your application and your resume.  Just

23       confirm for me that's what those are.

1   A.   That's it.

2   Q.   Okay.  And up at the top of Exhibit 5, it

3        says that you're applying for a Laborer 1

4        or -- I think it's a mason, a cement mason;

5        is that correct?

6   A.   Yeah.

7   Q.   If you'll flip to paragraph 19 in Exhibit 4

8        which is your complaint --

9            I'll just set these aside.

10   A.   Okay.

11   Q.   Paragraph 19 -- I'm summarizing -- it says

12        that you had a lot of good qualities and

13        experience, yet you were hired as a Laborer

14        1.  That was the position that you applied

15        for, right?

16   A.   Yeah.

17   Q.   Did you have an interview?

18   A.   Yes.

19   Q.   Who interviewed you?

20   A.   Donald Dotson.

21   Q.   Did you have a problem with the fact that

22        you were hired as a Laborer 1?

23   A.   No.

26

1    Q.    Okay.  And so when did you begin working

2          for the Board?  And I'll show you --

3                    (Defendant's Exhibit 7 was marked

4                    for identification.)

5    Q.    I'll show you what I've marked as Exhibit

6          7.

7    A.    Where is the application?

8    Q.    I'm sorry?  The application is here.  When

9          did you begin working for the Board?

10   A.    Whatever date on the application.  What

11         date is on the application?

12   Q.    Let me show you Exhibit 7, and that appears

13         to be your appointment letter appointing

14         you to your position as Laborer 1; is that

15         correct?

16   A.    Yes.

17   Q.    And according to this, it shows an

18         effective date for your employment of April

19         15th.  Does that sound about right?

20   A.    Yes.

21   Q.    Were you aware that this was going to be a

22         probationary position for three years?

23   A.    Yes.

27

1   Q.   And would you agree that the Board had the

2        right to non-renew you for any reason as

3        long as that reason was not illegal?

4   A.   No.

5   Q.   Were you aware of that or were you not

6        aware of that?

7   A.   Yes, I was aware of that if you weren't

8        tenured.

9   Q.   Okay.  And so if -- they could non-renew

10       you for any reason as long as it wasn't an

11       illegal reason?

12  A.   Yes.

13  Q.   And were you aware that the Board could

14       non-renew you without giving you a reason

15       within those three years?

16  A.   Yeah.

17  Q.   When you were hired as a Laborer 1, what

18       did you understand your day-to-day duties

19       to be?

20  A.   A Laborer 1 position is anything that -- in

21       the area of the Board, the facility, we

22       would work as -- normally, we was hauling

23       computers, going around and picking up

28

1           computers and different things.

2   Q.      Was it kind of whatever needs to be done?

3           Is that fair to say?

4   A.      Yes.

5                   (Defendant's Exhibit 8 was marked

6                    for identification.)

7   Q.      Let me show you what I've marked as Exhibit

8           8 which is a job posting that I got from

9           your attorney for a Laborer 1 position.

10          It's actually a 2004.

11                And if you'll look down at the duties

12          and responsibilities, does that look any

13          different -- I don't know if you ever saw a

14          copy of the job posting for what you

15          applied for.  But is that a fair

16          representation of what the duties and

17          responsibilities were for your position as

18          well?

19  A.      Yeah.

20  Q.      And were there any substantive differences

21          between the job that you were hired for and

22          what's represented there in Exhibit 8?

23  A.      Say that again.

29

```
1   Q.   Were there any differences between what you
2        were hired to do and what's listed here as
3        potential and possible job responsibilities
4        in Exhibit 8?
5   A.   Okay.  I was hired to do these things, but
6        the job that I was doing wasn't on here.
7                    COURT REPORTER:  I'm sorry?  The
8                    job that you were doing?
9                    THE WITNESS:  Is not stated on
10                   this sheet.
11  Q.   And what are you referring to, the job that
12       you were doing?
13  A.   Cutting grass, washing cars.
14  Q.   What department did you work in?
15  A.   The Logistics department.
16  Q.   And when you were hired, who was over that
17       department?
18  A.   Donald Dotson.
19  Q.   What was his race?
20  A.   Black.
21  Q.   Was he your immediate supervisor?
22  A.   He was the director of Logistics.
23  Q.   Was he the one who would evaluate you and
```

30

1       give you job assignments?

2   A.   Yes.

3   Q.   Did you have any problems with the way

4       Mr. Dotson treated you between April 2002

5       when you were hired and, say, the end of

6       that school year, the '02-03 school year?

7   A.   No.

8   Q.   What about anybody else in that department

9       during that first year and few months that

10      you were hired?

11  A.   No.

12  Q.   Are you aware of any concerns or problems

13      Mr. Dotson may have had with you or your

14      job performance?

15  A.   We didn't have a problem that I ...

16  Q.   Did you work offsite sometimes?

17  A.   Yes.

18  Q.   Do you know if he received complaints that

19      when you were offsite, you wouldn't do your

20      work as well?

21  A.   No.

22  Q.   Did he ever talk to you about that?

23  A.   No.

31

1    Q.    Did he ever talk to you about a concern he

2          had about you not getting along with your

3          co-workers?

4    A.    Yes, he had mentioned something about that.

5    Q.    What did he say?

6    A.    Well, it wasn't just a -- He never came

7          right up and said that you is having a

8          problem with someone that was working, I'm

9          not going to let you work with them.  He

10         would just say, what are y'all doing out

11         there?  That was it.  It wasn't nothing

12         like there was a negative eyesight he had

13         on me or anything like that.

14   Q.    I'm just trying to understand what you

15         said.  I'm sorry.  Can you tell me again

16         what --

17   A.    It wasn't like he was just -- you know,

18         like I'm sitting, looking at you, and he

19         was holding me liable for that, that I

20         couldn't get along --

21   Q.    He didn't call you in and reprimand you?

22   A.    No.

23   Q.    Just tell me what he -- And that's fine.

37

1       9 and ask you if you recognize that.

2  A.    Yeah.

3  Q.    Did you write that letter to Mr. Todd?

4  A.    Yeah.

5  Q.    In that letter, you appear to make a

6       complaint regarding Mr. Todd reprimanding

7       you in front of employees --

8  A.    Yeah.

9  Q.    -- as well as some other comments that you

10      made which I'm going to ask you about.

11          You referred to a meeting on August

12      12th in that letter.  Who all was in that

13      meeting?

14  A.    Jacky Todd, Mike Strength, Lewis Gunter,

15      Ronnie Cosby, and Joe Allen.

16  Q.    Do you remember Tommie Williams?

17  A.    Yeah.

18  Q.    Do you remember if he was in that meeting

19      or not?

20  A.    I don't think he was in there.

21  Q.    Okay.  What's Joe Allen's race?

22  A.    Black.

23  Q.    What's Lewis Gunter's race?

38

1    A.    White.

2    Q.    Mike Strength?

3    A.    White.

4    Q.    Tommie Williams?

5    A.    Black.

6    Q.    Ronnie Cosby --

7          You're saying Cosby.  Is it Ronnie

8          Causey?

9    A.    Cosby.

10   Q.    Okay.  I know there's a Ronnie Causey that

11         works over there, so I'm going to call him

12         Ronnie Causey.  Okay?  But I'm talking

13         about the same person, I think, that you

14         are.

15         And is he white?

16   A.    Yeah.

17   Q.    And with the exception of maybe Tommie

18         Williams, everybody was in that meeting,

19         including you and Jacky Todd?

20   A.    Yeah.

21   Q.    Do you remember if any of these guys worked

22         in the custodial supply department?

23   A.    Lewis Gunter, Joe Allen.

40

1  Q.  Did Joe say what the meeting was about

2      except for the fact that it was about you?

3  A.  All he just said, the meeting -- we've got

4      to have a meeting in Mr. Todd's office and

5      it was about you.

6  Q.  Did y'all go right in?

7  A.  Yes, they called me in --

8  Q.  Okay.

9  A.  -- about ten minutes after they called

10     everybody ...

11 Q.  So everybody went in -- These guys went in

12     first?

13 A.  No.  Jacky Todd and Mike Strength was

14     already in there.

15 Q.  Okay.  Then what happened?

16 A.  Then when I returned -- I guess Joe Allen

17     went down there and told them I was back,

18     and then Lewis Gunter and Joe Allen and

19     myself and Ronnie went in.

20 Q.  So the four of you went in together?

21 A.  (Witness nods head up and down.)

22 Q.  But Jacky Todd and Mike Strength were

23     already in there?

41

1    A.   Yes.

2    Q.   During that meeting, did Mr. Todd say words

3         to the effect that someone was making

4         comments about race in the department?

5    A.   Yes, Jacky Todd made that statement.  He

6         said he would reprimand -- if anybody bring

7         up anything about race, he will fire

8         them -- terminate them right then.

9    Q.   Okay.  Did he say that comments about race

10       were inappropriate or any words to that

11       effect?

12    A.  Well, the way I took it is, it was

13       inappropriate to me, I mean, because the

14       way it was stated to me, that if you

15       make -- say anything about any kind of race

16       or discrimination, you will be terminated.

17    Q.  Did he say discrimination or is that your

18       word?

19    A.  It was race.

20    Q.  Okay.  Well, did he say what he was talking

21       about, what he was referring to?  Did he

22       say somebody was making discrimination

23       complaints?

42

```
 1   A.   No, no, no.  See, what had happened, Ronnie

 2        Cosby and I had had some words out on the

 3        dock, and so that's where that led to.

 4   Q.   What kind of words had y'all had out on the

 5        dock?

 6   A.   About him being my boss and I was to do

 7        what he'd tell me to do.

 8   Q.   And did you have a response to that?

 9   A.   I told him I wasn't doing anything that you

10        tell me to do.

11   Q.   Did you or he say anything about race

12        during this interaction on the dock?

13   A.   No.

14   Q.   Okay.  Did you think that's what Mr. Todd

15        was referring to when he --

16   A.   Because they had pre-planned it.  I wasn't

17        there when they planned it.  What else were

18        they going to say?  They had already

19        planned the meeting before I got there.

20        Ronnie had went down there and told them

21        about what had happened, had transpired.

22   Q.   Okay.  You and -- I'm sorry.  Go ahead.

23   A.   So that's why I'm saying that he made that
```

43

1    statement, I think. It's not like that he

2    was taking one side.

3  Q.   When you and Ronnie had your confrontation

4        or conversation on the dock, you didn't say

5        anything about race; is that correct?

6  A.   No.

7  Q.   And he didn't say anything about race?

8  A.   No.

9  Q.   But you believe that that was the reason

10       that Jacky Todd had this meeting?  Did you

11       think that that confrontation led to this

12       meeting, because Ronnie had said -- Ronnie

13       went to him and said something about it?

14  A.   Yeah, there was more that was said --

15       that's the reason the meeting took place

16       because of Ronnie and I having words out on

17       the dock.

18  Q.   Okay.

19  A.   And rather than -- They had planned all of

20       this before I got back.

21  Q.   When you say they, who are you talking

22       about?

23  A.   Joe Allen, Lewis Gunter, and Ronnie.  See,

44

```
 1        I had left from -- I had been out in the

 2        field working, and I think it was --

 3        supposed to have went to pick up some

 4        science kits.  I was supposed to have been

 5        going with Ronnie Cosby.

 6            And he made the statement that, you

 7        know, I'm your boss and you're just going

 8        to have to do what I say.  And I said,

 9        you're not my boss and I'm not doing

10        nothing you say.

11   Q.   Do you have any opinion about why they

12        would have planned this?  Did you think

13        they were doing something that was -- where

14        they were out to get you?

15   A.   No, it was nothing like that.

16   Q.   Can you tell me what you mean when you say

17        they planned this while you were out?

18   A.   They had discussed it.  Why would you have

19        a meeting when I get back if it hasn't been

20        discussed?

21   Q.   And when you say they, you mean Joe Allen,

22        Mike Strength, Jacky Todd, all these guys?

23   A.   Ronnie had to -- Jacky Todd got to call the
```

45

1       meeting, so he got to have told Jacky Todd.

2  Q.  Okay.

3  A.  And so as the witness -- Joe and all the

4       rest of them was the witness.

5  Q.  Okay.  They were out there when you were

6       talking to Ronnie?

7  A.  Yes.

8  Q.  Okay.  The question I was trying to get to

9       was, do you know how race came into the

10      meeting that was called if y'all didn't

11      talk about race?  Do you know why --

12  A.  Jacky Todd made that statement because he

13      didn't want to feel like that he was taking

14      sides with Ronnie.

15         The meeting was called because of the

16      confrontation between Ronnie and I.  So he

17      called me in and used Joe and them for the

18      witnesses to make me be wrong.

19  Q.  Did Joe say anything during that meeting?

20  A.  Joe didn't say anything.

21  Q.  Did Mr. Todd say the comments about race

22      would not be tolerated or words to that

23      effect?

46

1   A.   If anybody make any kind of racial, then I
2        will determine -- I will terminate them
3        right then.  In other words, he was telling
4        me if I said that you was being prejudiced
5        because Ronnie came in here and told you
6        this, that's what that was.
7   Q.   Are you saying that's how you took it or
8        that's what he said?
9   A.   He said -- He said if anybody say anything
10       about race, he would terminate them.
11  Q.   When he -- I guess he was standing up, and
12       he talked to the group.  Was he talking to
13       you or was he talking to the group?
14  A.   He wasn't standing up.  He was sitting --
15       Everybody was sitting down.
16  Q.   Okay.  Did you think he was talking --
17  A.   He was talking to me.
18  Q.   Did he turn to you and say, Bobby, I
19       heard --
20  A.   He was looking at me just like you.  I was
21       sitting facing him.  Mike was sitting over
22       to the left.  Jacky Todd was sitting at his
23       desk.  Ronnie Cosby was sitting to my

1       right.   Joe Allen was sitting to the right

2       of Ronnie Cosby, and Lewis was sitting to

3       the left.

4   Q.  Did he say anything like if you say

5       anything about race, I'm going --

6   A.  No.

7   Q.  -- to have you terminated?

8           Did he look off to the other men that

9       were sitting in the meeting?

10  A.  He didn't look -- We always had eye

11      contact.

12  Q.  Did he call you by your name when he was

13      making these statements?

14  A.  No, he didn't.

15  Q.  But he was sitting across from you, and he

16      was looking right at you when --

17  A.  Was sitting right there looking at me.

18  Q.  Did he call anybody by name when he started

19      talking?

20  A.  No.

21  Q.  Okay.  During that meeting, did you raise

22      your hand and say that you were the one

23      that made the comments?

49

1        you to the personnel director?

2    A.   No.

3    Q.   Do you remember him saying that?

4    A.   (Shakes head from side to side.)

5    Q.   Do you believe it's appropriate to make

6         comments about race in the workplace?

7    A.   No.

8    Q.   And if a white person were making comments

9         about race, do you think that would be

10        appropriate?

11   A.   No.

12   Q.   If comments about race are being made in

13        the workplace and some employees complained

14        about it, do you have a problem with a

15        supervisor calling everybody in and having

16        a meeting about it?

17   A.   No.

18   Q.   Do you remember ever speaking in that

19        meeting at all?

20   A.   I had told him what had happened on the

21        dock.

22   Q.   Did you volunteer the information or did he

23        ask you for that information?

50

1  A.  I responded to Ronnie Cosby's statement.

2  Q.  So people started talking in the meeting?

3  A.  Ronnie Cosby started talking.

4  Q.  And what did Ronnie say?

5  A.  He said that -- he had got the idea -- He

6      had got really upset about the situation

7      because he had made the statement that he

8      don't want to go out with me because of the

9      fact -- he was using the status, a Level 2

10     and a Level 1, that's how it transpired,

11     which is I was supposed to do what he say

12     do.  And I told him I wasn't going to do

13     that.

14         And he was telling Mr. Todd about it.

15     And I told him he wasn't my supervisor and

16     I'm not to do what he's telling me to do,

17     and that's how it started.

18 Q.  So Jacky Todd made some statements in the

19     meeting about anybody talking about race is

20     going to get fired?

21 A.  Yes.

22 Q.  I imagine he said a little bit more than

23     that, but maybe not.

51

1        Ronnie Causey said, well, I don't want
2    to go out with Bobby because Bobby doesn't
3    want to do what I say?  What did Ronnie say
4    in the meeting?

5  A.   He was leading to that.  I don't know
6    exactly the words he said, but it had got
7    to the point that I wasn't going to do what
8    he said because he's not my supervisor and
9    I'm not to do what he says.

10       If you look on Level 1 and Level 2,
11    there's no supervision there.  There's no
12    reason for it.  That's just a law that they
13    had out there.  There's no reason for me to
14    do what -- Mike Strength was the
15    supervisor.

16  Q.   Did Ronnie Causey say your name in that
17    meeting?

18  A.   Yes, he called my name.

19  Q.   And when he said something about you, you
20    then said that you weren't going to do what
21    he said because he was only a Level 2?

22  A.   Yes, he's not a supervisor.

23  Q.   So after you said that, then what happened?

52

1    A.    The meeting ended.  It wasn't nothing else

2          said because the meeting was, I guess,

3          ended.  They got the point across, and that

4          was it.

5    Q.    Did you feel like you were being

6          reprimanded?

7    A.    Yes.

8    Q.    Who did you feel like was reprimanding you?

9    A.    Jacky Todd was.

10   Q.    But did he ever call your name?

11   A.    Well, the meeting was for me, about me.

12   Q.    Did he ever call your name during that

13         meeting?

14   A.    I can't recall it.

15   Q.    Did you feel like this was a meeting where

16         he was reprimanding you or was it more of a

17         group meeting about a problem that was

18         going on?

19              And I wasn't there, so I don't know.

20         That's why I'm asking you.  And maybe I'm

21         just misunderstanding what was going on.

22   A.    It was a reprimand meeting because -- and

23         they was using those other guys for the

1   witness.

2 Q. Because they witnessed what happened

3   between you and Ronnie Causey or to witness

4   this meeting?

5 A. Yes.

6 Q. Did y'all work in the same department --

7 A. No.

8 Q. -- all these guys that were in the meeting?

9 A. Joe Allen and Lewis Gunter work in the same

10   department.  That's where you goes to pick

11   up your merchandise from.  Ronnie Cosby was

12   just standing down there, I guess, smoking

13   or something.

14 Q. You say in Exhibit 9 in this letter that

15   you felt very threatened by the comments

16   you made concerning my tenure.  What

17   comments did Mr. Todd make about your

18   tenure during that meeting?

19 A. I can't recall.

20 Q. And you also said that -- you were quoting

21   him, it appears -- I had better not say it

22   was a black-white issue or you, yourself,

23   will take me to the personnel director.  Do

54

1       you remember --

2   A.   That wasn't said like that.

3   Q.   Okay.

4   A.   That wasn't stated like that.  The only

5        thing he said, if anybody use any

6        black-white, racial, I will reprimand them.

7   Q.   Okay.  So that sentence right there is a

8        mistake?

9   A.   Yes.  I mean, I never heard anybody say

10       anything about going to the personnel

11       department about that.

12  Q.   Do you know why you put that in this

13       letter?  If it's a mistake, that's fine.

14       I'm just asking.  I'm just trying to

15       clarify.

16  A.   That's what I'm telling you about when he's

17       saying reprimand -- well, I just put

18       personnel.  Reprimand, I guess that's the

19       only way you can get fired, is go to the

20       personnel department.  But that's all that

21       was saying.

22  Q.   Okay.  So you wrote Exhibit 9, and did you

23       give that to Mr. Todd?

55

1    A.    Yeah.

2    Q.    And did he ever discuss that letter with

3          you?

4    A.    No, I never discussed the letter with

5          Mr. Todd.  I only discussed the letter with

6          Jimmy Barker.

7    Q.    Did he report you to the personnel director

8          after that meeting or after he got that

9          letter from you -- about that letter?

10   A.    No.  I always had a meeting with my union

11         representative, Jerry Morris.

12   Q.    And so in the fall of 2003, you've -- I

13         guess you've been hired since April, and

14         we're into the fall now.  Did you apply for

15         the position of Laborer 3?

16   A.    Yes.

17   Q.    Okay.  And is this the position that you

18         refer to in paragraph 20 of your complaint,

19         Exhibit 4?

20   A.    Yeah.

21   Q.    And who did you apply -- Did you do another

22         application or do a letter?

23   A.    Yes, a Laborer 3 like that come out, and

56

1     all you have to do is send in a notice to

2     the personnel director that you were

3     interested, and they'll call and set up an

4     interview.

5  Q.  Do you remember what kind of job duties

6     that that position required?

7  A.  A Laborer 3 is a job -- There's various

8     jobs.  See, these jobs like here are just

9     support jobs, and they could make it be any

10    type work.

11        Like they had -- This was going to be

12    working with the science kit.  That Laborer

13    3 there was -- Laborer 3, it's really like

14    technical work or something like that I

15    guess you could say.

16  Q.  So in all of these jobs, you kind of go

17    where you're needed, but this one was going

18    to be primarily working with science kits?

19  A.  Well, it's a Laborer 3 job.  Like you could

20    have a Laborer 3 -- like these guys go

21    around and take orders for the custodian.

22    Different type Laborer 3 jobs.

23        I guess you could work there a long

1        time and become a Laborer 3 and stuff like

2        that.

3   Q.   Okay.

4   A.   But a Laborer 3 is more like you're a

5        leader or something like that.  It's just

6        more money, that's all.  All of them are

7        support jobs.

8   Q.   You said something about science kits.

9        That's why I'm asking.

10  A.   Yeah, it would have been working with the

11       science kit with this Laborer 3.

12  Q.   Did anybody prevent you from applying?

13  A.   No.

14  Q.   Did you get an interview?

15  A.   Yes.

16  Q.   You go on to say in paragraph 20 that you

17       arrived to work one morning in November and

18       were startled to be called into Mr. Todd's

19       office for an interview.  Is that correct?

20  A.   Yes.

21  Q.   And who did you interview with?

22  A.   Mike -- Jacky Todd, Mike Strength, and

23       Betty Smith.

1  Q.  What was Mike Strength's position?

2  A.  Supervisor.  Well, I never knew that he was

3      a supervisor.  He was hired to be a person

4      that purchased the material for the school

5      system.  And I guess that was his other

6      little thing when he wasn't doing anything

7      to be a supervisor.

8  Q.  Okay.  What was his race?

9  A.  White.

10 Q.  And Betty Smith, what was her position?

11 A.  Secretary.

12 Q.  And what was her race?

13 A.  Black.

14 Q.  Were you asked a set of questions during

15     the interview?

16 A.  Three questions -- I think two questions.

17 Q.  Who was asking --

18 A.  Betty Smith asked one, and Jacky Todd asked

19     one.  I think Mike might have asked one.  I

20     can't recall.

21 Q.  Do you know if the other applicants that

22     applied for this job got interviewed the

23     same way when they got to work that

1       morning?

2   A.   I don't think but two people applied.

3   Q.   Okay.  Who applied for the position that

4       you know of?

5   A.   Bobby Garrison and Ronnie Cosby.

6   Q.   Do you know whether Lewis Gunter applied

7       for the position?

8   A.   No.  He was already a Laborer 3.  That

9       don't make sense.

10   Q.   Do you know if -- when anybody else that

11       applied for the position, do you know if

12       they were also interviewed one morning when

13       they got in for work?  Do you know one way

14       or the other?

15   A.   No.

16   Q.   And who got hired for the job?

17   A.   Ronnie Cosby.

18   Q.   And you told me he's white, right?

19   A.   Uh-huh.  (Positive response.)

20   Q.   And was he already working in Logistics

21       when he was hired?

22   A.   Yes.

23   Q.   And do you know if before he got this

61

1    office and he cleaned that up.  That's all

2    he ever told me.

3  Q.  Do you know whether or not he had better

4    evaluations than you?

5  A.  I don't think he even was hired there long

6    enough to have so many evaluations.  He

7    hadn't been there over a year, so ...

8  Q.  Had you been there a year?

9  A.  Yes.  I don't think he -- I don't think he

10    had been there to have over one evaluation

11    or two evaluations.  I don't think so.

12  Q.  Well, you were hired in April of '03,

13    right?

14  A.  Yes.  He was hired after I was.

15  Q.  Okay.  And this interview happened or this

16    job posting was November '03?

17  A.  Uh-huh.  (Positive response.)

18  Q.  So you had been there for six or seven

19    months?

20  A.  Yes, exactly.

21  Q.  When this job was posted, is it true that

22    Ronnie Causey was working mainly with the

23    science kits?

1    A.    No.  He was doing different things just

2          like driving a truck around, picking up

3          computers, picking up books, doing this --

4          Warren Davis was working with the

5          science kits.  The principal of -- what's

6          that?  Loveless?  Houston Hill?  After they

7          moved him -- removed him from the

8          principal's job, he came out to Logistics

9          to work with the science kits.

10   Q.    If you'll look at paragraph 16 of your

11         complaint.

12   A.    16?

13   Q.    Yes.  Does that say that Ronnie Causey had

14         been hired to work with science kits?

15   A.    That say he was assigned to pick up science

16         kits.  He wasn't hired to work with science

17         kits.  Didn't hire him to work with science

18         kits.

19   Q.    It says:  On or about August 5th, 2003,

20         Ronnie Causey, white male, and Plaintiff

21         were assigned to pick up science kits.  And

22         in parentheses, Causey is a white employee

23         who had been hired to work at Logistics as

1       a Laborer 2 with the science kits.

2         Is that a correct statement or an

3       incorrect statement?

4  A.  This is incorrect right here, to work with

5       the science kits.  You have to be a Laborer

6       3 to work with the science kits.

7  Q.  Okay.

8  A.  He might have been picking up some science

9       kits.  But work with the science kits, you

10      have to be a Laborer 3.

11  Q.  And before this, when y'all had that thing

12      out on the dock, were y'all going to pick

13      up some science kits?

14  A.  Yes.

15  Q.  Did he do that often?

16  A.  No, because those science kits don't -- I

17      think they stay out maybe a month or so,

18      and then we'll go out -- everybody will

19      pick them up.  Everybody deliver them.  I

20      mean, there's so many.  You know, imagine

21      60 schools.  Everybody that can drive goes

22      out and picks up science kits and delivers.

23  Q.  Do you know whether Betty Smith ranked you

64

| | | |
|---|---|---|
| 1 | | highest among the candidates? |
| 2 | A. | I don't know. |
| 3 | Q. | Did you get along well with her? |
| 4 | A. | Yeah. |
| 5 | Q. | Do you know if she ranked you lowest? |
| 6 | A. | I don't know. |
| 7 | Q. | Did anybody mention your race during that |
| 8 | | interview? |
| 9 | A. | No. |
| 10 | Q. | Did anybody say that you couldn't have that |
| 11 | | job because you were black? |
| 12 | A. | No. |
| 13 | Q. | Did anybody say that they wanted a white |
| 14 | | person for that job? |
| 15 | A. | No. |
| 16 | Q. | Do you have any evidence that you weren't |
| 17 | | hired for that job because of your race? |
| 18 | A. | Can you ask that again? |
| 19 | Q. | Do you have any evidence -- I know -- I |
| 20 | | understand that you believe that you were |
| 21 | | not hired for the Laborer 3 position |
| 22 | | because of your race.  Do you have any |
| 23 | | evidence to support that belief? |

65

1  A.  Yes.

2  Q.  What?

3  A.  Well, because they hired Ronnie Cosby for a

4     job, and he wasn't qualified.  He didn't

5     have the qualifications for the job.

6  Q.  What were his qualifications?

7  A.  Like I told you, all he ever did was clean

8     up.

9  Q.  Okay.

10 A.  I mean, for the Laborer 2 job, I mean, he

11    didn't do nothing but ride around and pick

12    up junk, I mean.

13 Q.  Whose decision was it to hire Ronnie

14    Causey?

15 A.  Pardon me?

16 Q.  Whose decision was it to hire Ronnie

17    Causey?

18 A.  Whose decision was it to hire him?

19 Q.  Yes.

20 A.  Who hired him?

21 Q.  Yes.

22 A.  I don't know.

23 Q.  In paragraph 21 of your complaint, you go

66

1      on to say that you appealed this incident

2      to Jimmy Barker.

3   A.   Yes.

4   Q.   Were you talking about this Ronnie Causey,

5      the promotion that he got?

6   A.   Yes.

7   Q.   And when did you appeal the incident?

8   A.   It's got December 1, 2003.

9   Q.   And I was going to ask you to tell me how

10     you appealed the incident.  You wrote a

11     letter to Jimmy Barker?

12  A.   Yes.

13  Q.   And what did you tell Mr. Barker?  Did you

14     talk to him or did you tell him -- or did

15     you write him the letter and that's how you

16     appealed it?

17  A.   Yes, I wrote him a letter.

18  Q.   In paragraph 22, you say that you and Jerry

19     Morris met with Mr. Barker on December

20     17th, 2003, that he listened to what you

21     had to say and he assured you that he would

22     look into things and be present for your

23     next interview.  Is that right?

68

1          What that was?  December?

2    Q.   You applied for the Laborer 3 in November.

3    A.   November.  Okay.  It was in November,

4         then.  That's the one he was supposed to

5         have been sitting in on, but it was

6         prior -- before that time that I went down

7         and talked to him about the job.  Then he

8         said on the next interview, I will come and

9         sit in on it.

10   Q.   Tell me about the Laborer 2 job you applied

11        for.  About when was that to the best of

12        your memory?

13   A.   I can't recall the exact date.

14   Q.   It was sometime between April and November;

15        is that fair to say?

16   A.   Yeah.

17   Q.   It was before this Ronnie Causey one?

18   A.   Yes.

19   Q.   Okay.  And did you get an interview for

20        that?

21   A.   I can't -- No, I didn't.  No, I didn't.

22   Q.   Do you know who applied for it?

23   A.   No.

69

| | | |
|---|---|---|
| 1 | Q. | Do you know who got the position? |
| 2 | A. | No. |
| 3 | Q. | And after you didn't get that job, you went |
| 4 | | to -- did you go see Mr. Barker or did you |
| 5 | | write him a letter or call? |
| 6 | A. | I wrote -- I seen -- I talked to Jerry |
| 7 | | Morris. Jerry Morris and I went down and |
| 8 | | talked to Mr. Barker. |
| 9 | Q. | Okay. And what did you tell Mr. Barker |
| 10 | | during that meeting? |
| 11 | A. | That I'm -- Well, when I wrote the letter |
| 12 | | to him, I went down there and discussed |
| 13 | | that I wasn't being treated fair with the |
| 14 | | hiring practice. And we discussed |
| 15 | | different things about it. And he said, |
| 16 | | well, to ensure you to get fair treatment |
| 17 | | next time, I will come in and sit in on the |
| 18 | | interview. |
| 19 | Q. | Did you say you wrote a letter to him? |
| 20 | A. | Well, Jerry and I went down first and |
| 21 | | talked to him. |
| 22 | Q. | Okay. So you had -- or you applied for a |
| 23 | | Laborer 2, but you didn't get an |

70

```
 1         interview?  You didn't get an interview for
 2         that?
 3   A.    No.
 4   Q.    And so you and Jerry Morris went to talk to
 5         Mr. Barker?
 6   A.    About it.
 7   Q.    Okay.  And why did you think you didn't get
 8         the Laborer 2 job?
 9   A.    Oh, I don't know.
10   Q.    Did you think that was because of your
11         race?
12   A.    No.
13   Q.    Okay.
14   A.    I don't know who got the job.  I can't say.
15   Q.    Okay.  What were you complaining to
16         Mr. Barker about regarding that Laborer 2
17         job?
18   A.    Well, I -- I can't recall that.
19   Q.    Okay.  But you applied for it, didn't get
20         an interview.  Somebody got hired.  You
21         don't know who.
22   A.    I don't know.
23   Q.    But you and Jerry Morris went to talk to
```

71

|   |    |                                                      |
|---|----|------------------------------------------------------|
| 1 |    | Mr. Barker.  Did you feel like when you              |
| 2 |    | talked to Mr. Barker that he listened to             |
| 3 |    | what you had to say?                                 |
| 4 | A. | Yeah.                                                |
| 5 | Q. | Did you feel like he was respectful of you?          |
| 6 | A. | Yeah.                                                |
| 7 | Q. | And he said that he wanted to make sure              |
| 8 |    | that everybody was being treated fairly and          |
| 9 |    | so he would sit in on your next interview?           |
| 10 | A. | Yes.                                                |
| 11 | Q. | Do you have any reason to believe that he           |
| 12 |    | was aware that interviews were going to              |
| 13 |    | take place when you got to work that                 |
| 14 |    | morning in November for a Laborer 3 job?             |
| 15 | A. | I don't think he knew.                              |
| 16 | Q. | Do you know if he intentionally broke his           |
| 17 |    | promise to you to come and sit in on your            |
| 18 |    | interview?                                           |
| 19 | A. | I don't know.                                       |
| 20 | Q. | So is that the only one interview you had           |
| 21 |    | after you got hired?                                 |
| 22 | A. | Yes.                                                |
| 23 | Q. | So there weren't any more interviews that           |

73

| | | |
|---|---|---|
| 1 | | position, and I think you're referring to |
| 2 | | the Laborer 3 position. |
| 3 | A. | Yes. |
| 4 | Q. | Do you know of some requirement they had to |
| 5 | | tell you who got hired? |
| 6 | A. | Did I know ... |
| 7 | Q. | Did you think they were required to tell |
| 8 | | you who they were going to hire? |
| 9 | A. | Yes, they should have.  They interviewed |
| 10 | | me. |
| 11 | Q. | Okay. |
| 12 | A. | They could have wrote a letter. |
| 13 | Q. | Do you know if they were required to or you |
| 14 | | just wanted them to? |
| 15 | A. | I don't know.  I don't know if they're |
| 16 | | required to do that. |
| 17 | Q. | But you would have liked it if they would |
| 18 | | have done that? |
| 19 | A. | Yeah. |
| 20 | Q. | You go on in that letter to say that Mike |
| 21 | | Strength has made racial statements.  It's |
| 22 | | that third paragraph on the first page.  Do |
| 23 | | you see that? |

74

1    A.    Uh-huh.   (Positive response.)

2    Q.    What were the statements that you were

3          referring to?

4    A.    One morning --

5                    THE WITNESS:  I was going to bring

6                         up about --

7                    (Attorney-client discussion.)

8    A.    One morning, Mike Strength was in the --

9          what you call the supply room.  And Lewis

10         Gunter was there, and this guy named -- I

11         think his name is Scofield.  I don't know

12         exactly his name.

13              But Jerome Williams and Johnny

14         Mitchell, those guys are assigned to me to

15         ride in the truck with me.  And Mike was

16         standing up by Lewis, and he was telling

17         Lewis to get Scofield to do something for

18         him.  And Lewis was telling him that he

19         couldn't get it done.  And Mike made the

20         statement that that's your monkey; you

21         handle it the way you want to.

22              That was reported to Mr. Dotson, too.

23    Q.    So this was back before Mr. Dotson left?

75

1    A.    Yes.

2          Myself, which is Bobby Garrison, and

3    Jerome Williams and Johnny Mitchell, all

4    three of us went into Mr. Dotson's office

5    and reported that.

6    Q.    Did he have any response or did he do

7    anything about that?

8    A.    He didn't do anything about it.  All he did

9    was say, well, he going to hurt hisself

10    eventually.

11    Q.    Okay.

12    A.    Okay.  And we left it like that.

13    Q.    Did you have a problem with Mr. Dotson's

14    response to you?

15    A.    No.

16    Q.    Were there any other statements -- racial

17    statements that you heard Mike Strength

18    make?

19    A.    He made a statement out -- if you recall

20    back when Cloverdale was being moved, we

21    sent to -- the tractor-trailers over there,

22    and they had the football guys out there.

23          What had happened, one of them had

76

1          taken the fire extinguisher and skeeted all

2          the water or whatever was in there out on

3          the ground, and he laid it down.  And all

4          of us was standing at the back of the

5          truck, and he walked up and picked the

6          thing up and asked who skeeted the mixture

7          of whatever was in the fire hydrant out.

8          Wouldn't nobody never say nothing.

9              And he made the statement that, all of

10         you-all was standing out here and didn't

11         see nobody skeet the foam out of the fire

12         hose?  And then wouldn't nobody say

13         nothing, and he just turned and walked off.

14    Q.    So you said all you-all?

15    A.    You-all.

16    Q.    Did you take that to be a racist statement?

17    A.    Yes.  There was nothing but blacks out

18         there.

19    Q.    Who was the supervisor when that happened

20         or the director?

21    A.    Donald Dotson.

22    Q.    Did y'all report that or did you report it?

23    A.    We didn't report that.

77

| | | |
|---|---|---|
| 1 | Q. | Anything else?  Any other racial statements |
| 2 | | or racist statements Mike Strength made? |
| 3 | A. | That's the only ... |
| 4 | Q. | In Exhibit 10, did you tell Mr. Barker |
| 5 | | about those statements other than just |
| 6 | | saying he had made some racial statements? |
| 7 | A. | No, I didn't pinpoint it like that. |
| 8 | Q. | You say that Mike Strength assigned |
| 9 | | demoralizing tasks to blacks; is that |
| 10 | | right? |
| 11 | A. | Yeah. |
| 12 | Q. | And what did you consider a demoralizing |
| 13 | | task? |
| 14 | A. | I was asked on several occasions to go out |
| 15 | | and -- like you'll see on there, the |
| 16 | | supervisor thing, to wash his car and wash |
| 17 | | the director car, so I did that. |
| 18 | | Next, he would send you out there like |
| 19 | | at 12 o'clock in the day.  I never seen a |
| 20 | | white person out there cutting grass.  And |
| 21 | | you had to cut this whole big field out |
| 22 | | there with a push mower.  We had to do |
| 23 | | that. |

78

1          And one of the -- what's his name had

2      to go over to Daisy Lawrence -- that's

3      where -- In the basement, we carried the

4      computers and things down there, and that's

5      where they used -- was using the storage

6      area for, the computers and things.  And

7      all the sewage pipe had busted and drained

8      down in there.

9          He sent Jerome Williams, myself, and

10     Johnny Mitchell over there I guess for a

11     week or two.  One of the guys got sick from

12     it, and they -- Jerome Williams, I think.

13     I don't know if he quit or -- because he

14     didn't show up for two or three days.  I

15     don't know if they fired him or he just

16     quit.

17         And it wasn't nothing but blacks over

18     there.

19  Q.  So in that Exhibit 10, you told Mr. Barker

20     the example about Mike Strength saying get

21     out there and wash my car and wash Jacky

22     Todd's car, too.  You told him about that

23     one?  Yes or no.

79

1    A.    Yes.

2    Q.    And did you wash the cars?

3    A.    Yes.  That was Mr. Dotson's car, too, now.

4    Q.    Okay. So you washed Mr. Dotson's car as

5          well?

6    A.    Yeah.

7    Q.    And is it correct --

8    A.    Well, before -- before Jacky Todd got

9          there, we was doing this -- I was doing

10         this all the time.

11   Q.    Was Mike Strength under Jacky Todd -- I'm

12         sorry, under Donald Dotson as well as Jacky

13         Todd?

14   A.    Yes.

15   Q.    Okay.

16   A.    Those were the directors.

17   Q.    Okay. I thought you told me that Donald --

18         or Mr. Dotson and Mr. Todd gave you your

19         duties.  Did Mike Strength give you duties

20         as well?

21   A.    They come from the director, all -- the

22         director to Mike Strength.  He can't give

23         you direct -- Mike Strength didn't give --

80

```
 1                    (Brief interruption.)
 2     A.    Mike Strength didn't give -- Mr. Dotson
 3           give the directions or Mr. Todd give the
 4           directions to him.
 5     Q.    And then Mike Strength would tell y'all
 6           what to do?
 7     A.    Uh-huh.  (Positive response.)
 8     Q.    And is it true that all of those men --
 9           Mr. Dotson, Mr. Todd, and Mr. Strength --
10           they drive Board vehicles?
11     A.    Yes.
12     Q.    Were those the cars they were asking you to
13           wash?
14     A.    Yes.
15     Q.    And you thought it was demoralizing to be
16           asked to wash a Board vehicle by your
17           supervisor?
18     A.    Well, it wasn't a responsibility.  It
19           wasn't -- it was not a requirement to
20           wash --
21               I didn't say that was demoralizing.
22           I'm saying it wasn't required to be done as
23           a Laborer 1.  I mean, nowhere in there that
```

81

```
 1          you're going to see where it's -- in the

 2          Laborer 1 structure that you have to wash a

 3          car.

 4     Q.   Is it fair to say that as a Laborer 1 --

 5          would there be any way to list every job

 6          responsibility?

 7     A.   Yes.  How are you going to hire somebody?

 8          I mean, you're going to get close around

 9          there.

10     Q.   Okay.  I'm going to look at -- I'm looking

11          at Defendant's Exhibit 8.  If you'll look

12          down here at this last line, it says any

13          other duties within operations as

14          directed.

15               Isn't that kind of like a catch-all?

16          Because sometimes things come up that -- Is

17          that fair to say, sometimes things come up

18          that have to be taken care of?

19     A.   Well, vice versa.  Cutting grass, you have

20          a grass crew to cut that.  Why would I have

21          to go cut the grass?

22     Q.   So you consider it demoralizing to wash a

23          car?
```

1    A.    Yes.

2    Q.    Because it wasn't listed as a job

3          responsibility; is that --

4    A.    It was not a responsibility.

5    Q.    And who should have been washing the cars

6          do you think?

7    A.    He should have kept his own car washed.

8    Q.    Wasn't that a Board vehicle?

9    A.    Yes.

10   Q.    Did anybody besides you have to wash the

11         cars?

12   A.    I don't know who washed the cars before.

13   Q.    And are you saying that you never, ever saw

14         a white employee wash a car?

15   A.    No, they didn't wash cars or cut grass.

16   Q.    Okay.  During the fall semester of 2003

17         before you wrote that letter to Mr. Barker,

18         Exhibit 10, what percentage would you say

19         of laborers were black, just ballpark?

20   A.    95 percent.

21   Q.    95 percent of the laborers were black?

22   A.    Yes.

23   Q.    Did Mr. Strength ever say that he was

83

1       making you wash cars because you were

2       black?

3  A.   95 percent of them were black.

4  Q.   Did he ever say that you -- he was making

5       you wash a car because you were black?

6  A.   No.

7  Q.   Or making anybody wash a car because they

8       were black?

9  A.   No.

10  Q.   Did he ever say that he didn't want white

11       employees washing cars?

12  A.   No.

13  Q.   Do you believe that he made you do that

14       because you were black?

15  A.   I don't understand that question.

16  Q.   Do you believe that because Mike Strength

17       was white and you were black, that that's

18       why he made you wash cars?

19  A.   Yes.

20  Q.   Okay.  And do you have any evidence to

21       support your belief?  Why do you believe

22       that?

23  A.   Because of the fact -- Why would he tell me

84

| | | |
|---|---|---|
| 1 | | to go cut grass at 12 o'clock up in the |
| 2 | | day? |
| 3 | Q. | I'm going to ask you about the grass, but |
| 4 | | can you tell me about the cars, washing the |
| 5 | | cars?  Why do you think that related to |
| 6 | | your race? |
| 7 | A. | Because in his eyesight, I feel like he |
| 8 | | felt like that's what I should be doing. |
| 9 | Q. | And that's not because he was your boss and |
| 10 | | you were a laborer?  That's because he was |
| 11 | | white and you were black in your opinion? |
| 12 | A. | He was white, and he was my boss. |
| 13 | Q. | Okay.  Do you have any other evidence to |
| 14 | | support your belief that he made you do |
| 15 | | that because you were black? |
| 16 | | And if you don't, that's fine.  If |
| 17 | | that's what you believe, that's fine.  And |
| 18 | | I'm not sticking you on that.  I'm just -- |
| 19 | | I need to ask the question is all. |
| 20 | A. | No, I don't. |
| 21 | Q. | Okay.  You also talked about having to cut |
| 22 | | grass.  Did you go out there and cut the |
| 23 | | grass with that push mower? |

85

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | And where were you cutting grass? |
| 3 | A. | Across the street from the warehouse. |
| 4 | Q. | Was that Board property? |
| 5 | A. | No. |
| 6 | Q. | Were they cutting the grass for somebody |
| 7 | | else? |
| 8 | A. | They had trucks out -- They had those |
| 9 | | tractor-trailer trucks that was on -- was |
| 10 | | parked out there.  I guess they was just |
| 11 | | keeping it cut. |
| 12 | | Sometimes, some guy would come out |
| 13 | | there with a big tractor and cut the whole |
| 14 | | field.  But then Mike would have me out |
| 15 | | there cutting grass when they didn't show |
| 16 | | up. |
| 17 | Q. | Was anybody cutting grass besides you aside |
| 18 | | from the guy you just talked about? |
| 19 | A. | The guy that I just talked about? |
| 20 | Q. | You just talked about a guy who would come |
| 21 | | out there with a big tractor. |
| 22 | A. | Oh, I don't know the guy.  I guess the |
| 23 | | people where they was renting it from |

1        contracted it out.  I don't know.

2  Q.   Is it fair to say somebody else was

3        responsible for cutting the grass, but when

4        they wouldn't show up, he'd ask you to do

5        it?

6  A.   Yeah.

7  Q.   Did he ask anybody besides you to do it?

8  A.   He had those kids from the summer program

9        would go out there, and they would tear the

10       mower up to keep from doing it.

11  Q.   And what was demoralizing about cutting

12       grass?

13  A.   I mean, like you say, I'm cutting grass

14       across the street, not even Board

15       property.  I mean, you're cutting a whole

16       acre with a push mower?

17  Q.   Okay.

18  A.   And you have a grass crew.  Eventually,

19       after all this came up, they started

20       sending people out there to cut the grass,

21       the same crew that cut the grass around the

22       schools.

23  Q.   And you think he was making you cut the

1    grass because you were black?

2  A.  Yeah.

3  Q.  Okay.  And you talked about the computers

4      at Daisy Lawrence.  Is that the school you

5      were talking about?

6  A.  Yes, that's where they were stored at.

7  Q.  Okay.  When was that?

8          Who was the director at that time?

9      Let's do it like that.

10  A.  Donald Dotson.

11  Q.  Do you know if that direction came from

12      Donald Dotson or if it came from Mike

13      Strength to go out there to Daisy Lawrence

14      and get those computers out?

15  A.  Mike Strength always give the work orders

16      out.

17  Q.  Do you know if Donald Dotson instructed

18      him --

19  A.  No, I don't.

20  Q.  I'm sorry?

21  A.  No, I don't.

22  Q.  I thought you told me a minute ago that the

23      director would tell Mike Strength what to

1      do.

2  A.  Yeah, but I can't say that somebody called

3      Donald Dotson and Donald Dotson -- I don't

4      know, but that's the way it was supposed to

5      have been.

6  Q.  Is that how you understood it worked?

7  A.  Well, I don't know if this incident

8      happened like that.  I don't know.

9  Q.  Did you report that incident to anybody

10     besides that letter to Mr. Barker there?

11  A.  No, there was no one else to tell.  The

12     peoples around -- that worked around it ...

13  Q.  Who do you think should have gone to the

14     school to get the computers out?

15  A.  I think first they should have got some way

16     to get the sewage out.  I don't know who

17     should have been there personally.  I mean,

18     it's ankle deep in there.  Maybe they

19     should call somebody to pump the water

20     out.  I don't know how they should have

21     done it.

22       But just sending me down there to get

23     the computers out and all the waste in

1    there -- I don't know who they should have

2    gotten to get the --

3        I wouldn't have minded going and

4    getting the computers out if it was clean

5    in there.  I mean, we do it all the time.

6    Go pick computers up all the time.  The

7    computers wasn't the problem, but the

8    working condition was the problem.

9  Q.  Were you-all wearing boots or anything?

10 A.  The school system would furnish us the jump

11    suits and ...

12 Q.  To keep your clothes from getting messed

13    up?

14 A.  Yes, and some little rubber boots, what

15    they used to mop floors or something.  Put

16    them over your other shoes or whatever.

17 Q.  So you wouldn't have had a problem with it

18    except for that there was raw sewage down

19    there?

20 A.  Yes.

21 Q.  How did that raw sewage get down there?

22 A.  I haven't the slightest idea.  I guess the

23    pipe up in the ceiling busted.  It was in

90

1        the basement.

2   Q.   In paragraph 18 of your complaint, Exhibit

3        4, you said Mike Strength made you and

4        other blacks cut the grass, pick up paper

5        and wash cars when work was slow; is that

6        right?

7   A.   Yes.

8   Q.   And Jerry Morris told you that wasn't your

9        job; is that right?

10   A.   Yes.

11   Q.   And who is Jerry Morris?

12   A.   The union -- The guy that was over the

13        union.

14   Q.   The Montgomery County Education Association

15        rep?

16   A.   Uh-huh.  (Positive response.)

17   Q.   Was Jerry Morris responsible for making

18        work assignments in Logistics?

19   A.   No.

20   Q.   And it was the supervisors' and director's

21        responsibility to make work assignments.

22        Is that fair to say?

23   A.   Yes.

1    Q.    What was demoralizing about having to pick
2          up paper?
3    A.    Well, we weren't only picking up paper.  We
4          were walking around picking up cigarette
5          butts and everything.  In my eyesight and
6          everything, I would just rather go home
7          than just walk around outside picking up
8          paper.  It wasn't -- It wasn't necessary.
9    Q.    Okay.
10   A.    I mean, it's not like that you're in a
11         field of paper blowing everywhere.
12   Q.    Okay.  Is it possible they just wanted the
13         area to be clean and so they asked you to
14         help clean up?
15   A.    When you get outside your warehouse, you
16         have somebody assigned to do that, like
17         cutting that grass.  They have people
18         assigned to do it.
19              Like washing the cars, they've got
20         somebody to wash cars over there at the
21         transportation.  The prisoners wash cars
22         every day over there.  How you think those
23         buses get washed?  The bus drivers don't

92

|     |    |                                              |
|-----|----|----------------------------------------------|
| 1   |    | wash them.  The prisoners wash them.  All    |
| 2   |    | they do is carry the cars out there and let  |
| 3   |    | them wash them.                              |
| 4   | Q. | That was outside your area of                |
| 5   |    | responsibility?  I mean, that's why you      |
| 6   |    | felt it was demoralizing; is that right?     |
| 7   | A. | I felt like that work task wasn't -- it      |
| 8   |    | shouldn!t have been used at that facility.   |
| 9   | Q. | Was that your responsibility or your         |
| 10  |    | decision to make, what jobs got done?        |
| 11  | A. | No, I did it.  I didn't make a decision.  I  |
| 12  |    | did it.  But I'm saying it shouldn't have    |
| 13  |    | been done.                                   |
| 14  | Q. | When Mr. Dotson was there, was there         |
| 15  |    | picking up paper and sweeping and things     |
| 16  |    | like that going on?                          |
| 17  | A. | Yeah.                                        |
| 18  | Q. | Did you have a problem with it then?         |
| 19  | A. | Well, stuff like -- that's minor.  Mike      |
| 20  |    | Strength might have made that decision.      |
| 21  |    | Mr. Dotson don't -- he don't make those      |
| 22  |    | decisions.  He make different type           |
| 23  |    | decisions.  Most of those are dealing with   |

93

1       the school.  Little stuff like that, Mike

2       Strength making those decisions.  That's

3       what I would say.

4  Q.   And you disagree with the decision that he

5       have you or anybody else cutting grass,

6       picking up paper and washing cars?

7  A.   Yes.

8  Q.   Okay.  Exhibit 10, which is that December

9       1st letter, you said that Mike Strength

10      spoke to you in a condescending tone in

11      front your co-workers.  During this meeting

12      Mike Strength leaned back unprofessionally

13      in the chair he was sitting in, propping

14      his feet on the desk just inches in front

15      of my face.

16         I want you to tell me exactly where you

17      were and exactly where he was.

18  A.   He was sitting directly in front of me.  He

19      was sitting on the side of Jacky Todd.  He

20      always sit on the side of him.  I guess

21      that's just the way he think.  I mean, this

22      is the director.  I'm this person.  He was

23      sitting with his leg crossed just like

94

1          that, looking right at me in my face.

2    Q.    Where were you sitting?

3    A.    I was sitting directly in front of him.

4    Q.    Did he put his foot up on the table?

5    A.    No, it's not a table like that.  It was

6          something like a little stool like thing.

7          It wasn't up on Mr. Todd's table.  It was

8          on -- It's like a little chair, but his

9          foot was aimed -- pointed toward me.

10   Q.    Do you see this chair here next to me?

11   A.    It wasn't that high -- yeah, it was about

12         that high.  It wasn't up high, elevated

13         that high.  I don't know -- I think he -- I

14         don't know what the purpose was.  He might

15         have had back trouble.  I don't know what

16         it was.

17   Q.    So he put his foot up on something --

18   A.    Yeah.

19   Q.    -- that was maybe a foot off the floor; is

20         that fair to say?

21   A.    (Witness nods head up and down.)

22   Q.    And you were sitting directly across from

23         him?

95

1    A.    I was sitting directly in front him.

2    Q.    Were you sitting up straight in your chair?

3    A.    Yes.

4    Q.    Were you leaning over any to be --

5    A.    No.  I was sitting straight up in my

6          chair.  I wasn't leaned over.

7    Q.    So tell me.  I'm trying to figure out how

8          close y'all were to each other, how far

9          away.  Was it from where I am to where you

10         are now, just without the table in the

11         middle?

12   A.    About the same distance.

13   Q.    I'm sorry?

14   A.    Probably the same distance.  Probably --

15   Q.    And I have long legs, but --

16   A.    Well, he was on the side, like -- like I'm

17         sitting directly in front of Jacky Todd,

18         and Mike -- it was almost catty-cornered --

19              You know, the little office out there,

20         it's not that big.  You have to move your

21         chair up to shut the door.

22   Q.    Okay.

23   A.    It's not that big.  It was pretty close in

96

1        there.

2   Q.   So when you're talking about this meeting

3        where he leaned back and put his foot up,

4        were you already sitting where you were --

5        where you were?

6   A.   Yes.  Everybody was in place.

7   Q.   And you said he was catty-corner.  Which

8        direction -- Was his foot pointed towards

9        you, was it pointed away or diagonal?  Tell

10       me how that worked.

11  A.   Well, it was pointed -- It was pointed at

12       an angle, about like that, about like my

13       leg is.

14  Q.   Tell me how close his foot got to your

15       face.

16  A.   Well, it wasn't that -- it was not close to

17       my face.  It wasn't that close.  It was

18       about -- Like I say, it's real tight in

19       there.  I can't really imagine how close --

20          I mean, it was pretty close.  I just

21       can't give you a -- six feet?  We were

22       about six feet away from each other.  It's

23       real tight.

97

1   Q.   Did you feel like he did that to be

2         disrespectful to you?

3   A.   Very.

4   Q.   Who all was in that meeting that would have

5         seen that?

6   A.   Jacky Todd and Mike Strength.  I can't

7         recall.

8   Q.   Do you think he did that because you're

9         black?

10   A.   I felt like he did it because I were.

11   Q.   In that letter, the December 1st letter,

12         did you provide Mr. Barker with any other

13         examples of what Mike Strength was doing

14         except for making you-all do the

15         demoralizing tasks and putting his foot up?

16   A.   No.

17   Q.   Did Jacky Todd talk to you in a

18         demoralizing manner?

19   A.   No.

20   Q.   Would it be a fair statement that Mike

21         Strength was -- had an abrasive manner,

22         generally speaking?

23   A.   I wouldn't say so.  Being in supervision, I

1    A.    He never -- I never heard him just say --

2          per se cuss or something, you know, not

3          directly at a person or something.  Maybe

4          if he had been talking about something, he

5          might have used a curse word.  But as far

6          as just cursing, I never heard him just --

7    Q.    Did you ever hear other employees complain

8          about the way he talked to them?

9    A.    Yes.

10   Q.    Do you know if any white employees

11         complained about the way he talked to them?

12   A.    I never heard them complain.

13   Q.    You say in paragraph 15 of your complaint,

14         Exhibit 4, that white employees are

15         allowed -- Mike Strength, in particular --

16         to demoralize black workers on a daily

17         basis.

18              What other white employees are you

19         referring to besides Mike Strength?

20   A.    Well, Lewis and -- I don't play, you know.

21         I don't know whether they be playing or

22         what else, you know.  I hear them, you

23         know, calling names and different things,

100

1    and Mike be there and they're laughing and

2    going on.

3         I wasn't -- I wasn't a part of that.  I

4    guess that's what was -- I don't tease.  I

5    don't play.  I'm for business.

6    Q.   Okay.

7    A.   Maybe that's what they was doing, but I

8    didn't do that.

9    Q.   Are you saying they joked too much?  What

10   are you --

11   A.   I don't know what they was calling it.  I

12   don't know if they was joking or what.  All

13   I know, they be calling one another bad

14   names and different things.  I don't know

15   if they joking or playing.  I don't deal

16   with that.  I don't --

17   Q.   You said they would be calling one another

18   bad names.  When you say they, are you

19   talking about the white men that worked out

20   there?

21   A.   Lewis is a white guy.

22   Q.   Are you talking about --

23   A.   Lewis be calling Joe a bad name.  They

1       worked together.

2    Q.   Joe Allen?

3    A.   Yes.

4    Q.   What would he call him?

5    A.   I guess -- I mean, drunkards.

6    Q.   Did he call him a drunkard?

7    A.   Drunkards, alcoholic.  What the issue

8       was --

9         One day I walked up.  They had all

10      these numbers on this calendar.  And, you

11      know, I asked them what those numbers

12      were.  That's where Joe would be borrowing

13      money from a guy.  That's how I found it

14      out.  10, 20, stuff like that.

15        And I guess that's how the name-calling

16      started coming.  I guess they was like

17      that, but I didn't see where it was

18      professional.

19    Q.   You didn't think it was funny?

20    A.   No.

21    Q.   Did they appear to have that kind of

22      relationship where they would do that back

23      and forth?

102

1   A.   You shouldn't have that type of

2        relationship.  I don't know what kind of

3        relationship they had.

4   Q.   Did Joe ever come and tell you that he

5        didn't like the way Lewis talked to him?

6   A.   No.

7   Q.   I know Mike Strength, Lewis Gunter.  What

8        other white employees demoralized black

9        workers?

10  A.   Well, wasn't nobody else out there but

11       Ronnie.

12  Q.   What would Ronnie do?

13  A.   Ronnie just -- you know, I guess he might

14       have been teasing, you know.  Like he was

15       telling me about I was going to do, you

16       know -- you know, whatever, you know, he

17       tells me.  Like I said, I made the

18       statement that I wasn't going to do that.

19  Q.   You said you thought Ronnie might have been

20       teasing or he might have been serious?

21  A.   He might have been serious.  I guess he see

22       what Lewis was doing.

23  Q.   When you saw this interaction between Lewis

103

```
 1        and Gunter, did it appear that Lewis was

 2        teasing with Joe -- I'm sorry, Lewis and

 3        Joe, did it appear that Lewis was teasing

 4        Joe to you?

 5   A.   No.

 6   Q.   It didn't appear that he was teasing him?

 7   A.   No.

 8   Q.   He seemed like he was serious?

 9   A.   To me.

10   Q.   Did you hear Lewis call Joe any racial

11        slurs?

12   A.   Not directly.

13   Q.   Not directly?

14   A.   No -- well, I never heard him say

15        indirectly or directly.

16   Q.   What about Ronnie Causey?  I know we talked

17        about what happened on the loading dock.

18        Is there anything else?

19   A.   (Shakes head from side to side.)

20   Q.   Did he say -- use any racial slurs or

21        anything like that?

22   A.   No.

23   Q.   Mike Strength -- Well, you told me about
```

1        two incidents.  Did Mike Strength use any

2        racial slurs?

3    A.   The only two I know about is when he called

4        the guy a monkey and the one he called

5        "you-all" at Cloverdale school.

6    Q.   Okay.  Prior to when you wrote this letter,

7        Exhibit 10, to Mr. Barker, other than

8        telling you to wash the cars and do other

9        tasks that you didn't think were your job

10        and putting his feet close to your face,

11        did Mike Strength do anything else you

12        didn't like?

13    A.   Yes, he did.

14    Q.   Tell me what.

15    A.   I think it was after all these things

16        transpired, I think it was -- he was really

17        trying to get back at me.

18    Q.   I'm talking about when you wrote your

19        letter to Mr. Barker.

20    A.   Yes.  Well, I'm about to tell you.  You

21        asked me about Mike Strength.  Mike

22        Strength get to work, I guess, about 5:00

23        in the morning or 6:00.  And this

1    particular morning, I guess, about 9

2    o'clock, he had asked me to go outside.

3        It was like a trailer, and it had some

4    bricks and things up on the side of the

5    trailer.  But up under the walk thing

6    there, it was two bags -- two boxes of

7    trash can liners out there in the morning.

8    And when I went out there to move the

9    bricks and things, I seen them out there.

10       So I went back in and told Mr. Dotson

11   about it.  Mike sent me over there to move

12   the bricks, and I -- I had -- the bags were

13   right by them.  And I went back in there,

14   and I told Mr. Dotson about them.

15       So he told me to go outside and pick

16   them up.  And I picked them up, and I

17   brought them in to his office.  Later on

18   that day, I seen the bags in Mike

19   Strength's office.

20       I believe Mike Strength placed those

21   bags out there.

22   Q.  I don't exactly understand.  What was wrong

23   with bags being out by the bricks?  It may

| | |
|---|---|
| 1 | | just be because I don't understand the |
| 2 | | setup of Logistics, but what was the |
| 3 | | problem with the bags being outside? |
| 4 | A. | No.  Listen to me.  These bags was outside, |
| 5 | | whole cases of bags, and they was placed |
| 6 | | under there where he sent me to get the |
| 7 | | bricks from. |
| 8 | Q. | Okay.  What was wrong with that? |
| 9 | A. | Why would the trash bags be on the outside |
| 10 | | of the building up under the walk?  Two |
| 11 | | boxes of bags, brand new boxes. |
| 12 | Q. | And you said you thought he was doing that |
| 13 | | to get back at you? |
| 14 | A. | That's a setup.  I guess he thought I was |
| 15 | | going to take the bags or something. |
| 16 | Q. | Oh, you think he put bags outside -- |
| 17 | A. | He did that. |
| 18 | Q. | -- to entice you to take bags? |
| 19 | A. | Yeah, that's what he did.  He left them |
| 20 | | there. |
| 21 | Q. | Okay. |
| 22 | A. | And I picked them up -- Well, I went and |
| 23 | | told Mr. Dotson about it, and he told me to |

| | |
|---|---|
| 1 | bring them inside. I carried them on the |
| 2 | inside and gave them to him. |
| 3 | Later on that day, I checked. The bags |
| 4 | was in Mike Strength's office. |
| 5 | Q. Why do you believe Mike Strength was trying |
| 6 | to set you up? |
| 7 | A. Anything negative he always do. I mean, |
| 8 | who put them out there but him? I never |
| 9 | found out what happened with them. |
| 10 | Q. Had you made some complaints about Mike |
| 11 | Strength during this time or before this |
| 12 | time? |
| 13 | A. These complaints have been off and on. |
| 14 | Q. Okay. What about Mr. Todd? Before you |
| 15 | wrote this letter to Mr. Barker, other than |
| 16 | not hiring you for the Laborer 3 position |
| 17 | or, I guess, giving you an interview for |
| 18 | the Laborer 2, what had he done that you |
| 19 | didn't like? |
| 20 | A. He really -- He didn't do anything to me. |
| 21 | Q. Did y'all get along pretty well, you and |
| 22 | Mr. Todd? |
| 23 | A. Yeah. I just told him, go ahead and do my |

1         job.

2   Q.   You also say that whites are promoted over

3         blacks no matter how inexperienced they

4         are. Who are you referring to?

5   A.   Ronnie Cosby.

6            (Defendant's Exhibit 11 was marked

7            for identification.)

8   Q.   Let me show you what I've marked as Exhibit

9         11 and tell me what this is.

10   A.   That morning, Mike had give us some

11         instructions to pick up some computers that

12         was -- I used Andre Glover and Terrell

13         because they was standing there. And he

14         was telling me what -- how I should do.

15         And the only thing I was doing was --

16         after he had gave me the instructions what

17         to do, only thing I was doing, walking

18         away, which was about as far as from --

19         about ten yards, ten, you know, yards away

20         from him.

21         You know, I knew what I had to do.

22         Mr. Dotson had already told us what we had

23         to do. And he was coming back and telling

1      us what -- the way he wanted it to be

2      done.

3           The only thing I was doing, walking

4      off, because I knew what I had to do, and

5      that's when he yells at me about me walking

6      away from him.

7  Q.  This is a memo that you wrote to Mr. Todd,

8      right?

9  A.  Uh-huh.  (Positive response.)

10 Q.  And Mr. Dotson was already gone.  He had

11     moved over to another position, correct?

12 A.  Uh-huh.  (Positive response.)

13 Q.  What you've written here is that Mike

14     Strength asked you-all to cut the boxes

15     open and write the serial numbers off the

16     computers.

17 A.  Uh-huh.  (Positive response.)

18 Q.  Are you saying that that was fine with you

19     because Mr. Dotson had already shown you

20     how to do that?

21 A.  Yeah.  We had our -- We had what we had to

22     do.  Mr. Dotson didn't -- Let me go back to

23     this.

110

1          Mr. Dotson didn't like nobody doing

2     anything unless he look over it hisself and

3     show you exactly how he wanted it.

4  Q.  Okay.

5  A.  He had already planned and had the serial

6     numbers and everything wrote down.  We had

7     what we had to do and ready to go.  I

8     didn't need to -- We didn't need to hear

9     nothing else from Mike because it was going

10    to be a conflict there.

11         We had to do what the director said.

12    Mike only assigned the trucks, so there

13    wasn't no need in him telling me nothing

14    else because I wasn't going to do that no

15    way, because I had to do what the director

16    had given me.

17 Q.  Is that what you told him?

18 A.  I didn't say anything.  I just walked off.

19 Q.  It says:  I explained to him that

20    Mr. Dotson had already bar coded each

21    computer and had written a record of each

22    number.

23 A.  And I walked away.

111

1   Q.   So you did say something to Mr. Strength

2        after he gave you some instructions?

3   A.   Yeah.

4   Q.   Wasn't Mr. Dotson already gone by this time

5        and Jacky Todd was the director?

6   A.   Yeah, but it was still under his name.

7   Q.   Okay.

8   A.   Those computers were issued out to

9        Mr. Dotson.

10   Q.   What was your problem with just doing what

11        Mr. Strength said?

12   A.   That wasn't the problem.

13   Q.   Tell me what the problem was.  That's why

14        I'm asking.

15   A.   It wasn't a problem.  I'm doing what the

16        director before -- I mean, Jacky Todd had

17        just came in.  The computer was sent --

18        Mr. Dotson had gave us the instruction.  I

19        think they was working there together.  His

20        days might have been ending.  The director

21        have told us to go do these computers like

22        this.

23   Q.   Which director?  Mr. Dotson?

112

1   A.   Mr. Dotson.  Jacky Todd probably was just

2        working there till -- a few days and then,

3        you know, Mr. Dotson was going to be gone.

4        But at this point in time, we was

5        delivering the computers and he the one

6        that given us the work to do.

7   Q.   And so you told Mr. Strength that, and he

8        said to you, Mr. Dotson doesn't run this

9        department, it's how I want it done?

10  A.   Yeah.  That was his statement, because I

11       walked off.

12  Q.   Did you have a problem with his statement,

13       that this is how he wanted it done?

14  A.   The director was still in place.

15  Q.   So --

16  A.   Listen.  The director, his time hadn't

17       expired yet.  He still -- he the one -- If

18       he wasn't there, he wouldn't have given us

19       this paperwork to get done.

20  Q.   It says Mr. Dotson doesn't run this

21       department --

22  A.   That's what the statement -- what Mike

23       Strength was saying.

113

1   Q.   Was he incorrect when he said that?

2   A.   Yes, because Mr. Dotson was still -- that's

3        how we got the paper, from Mr. Dotson.

4        With the computer, he had drawn it out and

5        showed us what to do.

6             But he was leaving.  And Mike Strength

7        was saying that, you know, he don't run the

8        place.  True, we knew he was leaving.  But

9        the computers were still in his name, you

10       know.

11  Q.   Did Mr. Dotson leave in the middle of the

12       year or did he leave at the beginning of

13       the school year?

14  A.   I don't know was it at the end or the

15       beginning.  I really can't recall.

16  Q.   You don't remember if he was -- if they

17       were switching out -- if Jacky Todd and

18       Donald Dotson were changing positions in

19       the middle of the school year?  You don't

20       remember that happening?

21  A.   No.

22  Q.   What was the reason you walked away from

23       Mr. Strength?

114

1  A.  I already had my orders.

2  Q.  From Mr. Dotson?

3  A.  Yes.

4  Q.  But you agree Mr. Dotson was not your boss

5      at that time?

6  A.  He was still acting director.

7  Q.  Okay.

8  A.  Jacky Todd was taking over.

9  Q.  You sent the memo to Jacky Todd?

10  A.  Yes.  He probably was the director during

11      that time.  After that --

12          The computers came in under

13      Mr. Dotson's name, and I think it was like

14      a large sum of money where that he wanted

15      it to be done right, and that's how he left

16      it with that.

17  Q.  But Mr. Strength was your immediate

18      supervisor?

19  A.  Yes.

20  Q.  And he was the one that assigned the job?

21  A.  The jobs comes down from the director, and

22      the director tells Mike Strength and he

23      comes out and tells us.

115

1   Q.   Did you make mention of -- or did he make

2        mention of your race during this incident?

3   A.   No.

4   Q.   Do you think it had anything to do with

5        your race?

6   A.   I guess it was just showing authority, I

7        guess.

8   Q.   Is it true that a meeting was held on

9        January 7th with you, Jerry Morris, Mark

10       Casillas and Mr. Barker?

11  A.   Yes.

12  Q.   Is this a different meeting that's referred

13       to in paragraph 22 of your complaint, or is

14       it the same meeting?  It's on page seven.

15  A.   It's the ...

16  Q.   I think there's a conflict in the dates.

17       Look at paragraph 23 where you talk about a

18       January 20th meeting.

19            Let me ask it like this.  You wrote

20       your letter -- your December 1st letter and

21       sent it to Mr. Barker, right?

22  A.   Yes.

23  Q.   Is the next thing that happened that there

```
 1            was this meeting with you and Jerry Morris,

 2            Mr. Barker and Mark Casillas?

 3     A.     Yes.  I think Jacky Todd, too, was in

 4            there.

 5     Q.     Was it over here at the Board?

 6     A.     Yes.

 7     Q.     Did you have two meetings that involved

 8            Jimmy Barker and Mark Casillas and Jerry

 9            Morris and maybe Jacky Todd during the

10            same --

11     A.     No.  One meeting with Jimmy Barker, Jacky

12            Todd, Jerry Morris, and one meeting with

13            just Jimmy Barker.

14     Q.     Okay.  You told me about a meeting that

15            happened after you applied for the Laborer

16            2 position, right?

17     A.     Uh-huh.  (Positive response.)

18     Q.     And then we talked about a meeting that

19            happened after you sent your December 1st

20            letter.

21     A.     Yeah, the meeting about -- that's what I'm

22            saying, the Laborer 2, that was just with

23            Jimmy Barker and Jerry Morris.
```

118

1        fine.  I'll get him to tell me that.

2          What's Mr. Barker's race?

3  A.  Black.

4  Q.  And what's his position?

5  A.  Assistant superintendent.

6  Q.  Is he over human resources?

7  A.  I guess he over all the Board.

8  Q.  And is it your understanding that Exhibit

9      10, your December 1st letter, is that what

10     led to this meeting?

11  A.  10?

12  Q.  Exhibit 10.

13  A.  Yeah.

14  Q.  Did you-all talk about Exhibit 10 during

15     that meeting?  Do you remember?

16  A.  I don't recall that.

17  Q.  Were any of the men that you just talked

18     about disrespectful to you during that

19     meeting?

20  A.  No.

21  Q.  Do you feel like they listened to what you

22     had to say?

23  A.  They listened, but I think Jacky Todd had

119

1         some expression on his face. He about the

2         only one.

3   Q.  What kind of expression do you feel like he

4         had on his face?

5   A.  I was discussing -- I was -- I can't recall

6         the discussion. But, you know, he went to

7         turning red in the face and started

8         crossing his legs, making these

9         different -- he was sitting across in front

10        of me. Jerry Morris was sitting on the

11        side of me. He was making these kind of

12        expressions on his face.

13  Q.  During that meeting, do you remember if

14        Mr. Todd said anything that disagreed with

15        something that you said?

16  A.  I think it might have been a disagreement,

17        something that ...

18  Q.  I mean, did he say, Bobby, you know you're

19        not telling the truth or I don't agree with

20        what you're -- did he say anything that

21        indicated that he disagreed --

22  A.  He didn't verbally say anything.

23  Q.  He didn't verbally say anything?

120

1   A.   No.

2   Q.   Do you know what action, if any, that they

3          took in response to your letter in that

4          meeting?

5   A.   I think they called Mike Strength in, and

6          he had admitted to these things.

7   Q.   Do you know what he admitted to?

8   A.   He had admitted to some of these

9          allegations.  I don't know exactly what.

10         He had to, because the allegations had been

11         made.  He had -- They had to call him in.

12   Q.   Okay.

13   A.   So they gave him a written warning or

14         verbal warning or something because he

15         admitted it.

16   Q.   Do you know what he admitted to?

17   A.   No.

18   Q.   I know what allegations you made in your

19         letter.  Are you talking about the stuff in

20         your December 1st letter?

21   A.   Oh, yes.

22   Q.   Okay.  Do you know who called him in?

23   A.   Jimmy Barker had called him in.

121

1    Q.    How do you know that he got called in?

2    A.    I just know.  Jerry Morris told me.

3    Q.    Okay.  How do you know that he got a

4          written or verbal warning?

5    A.    Because Jerry Morris told me.  He had to

6          find -- He had to tell me something.

7    Q.    Okay.  When you were at that meeting, did

8          Mr. Barker or Mr. Casillas or Mr. Todd tell

9          you what they were going to do to try to

10         resolve this issue?

11   A.    Mr. Barker said give him two weeks and he

12         will get back with me.

13   Q.    Okay.  Did he do that?

14   A.    No, it was longer than two weeks.

15   Q.    But did he --

16   A.    But he said -- that's how I found out

17         this -- He told Jerry Morris.  Jerry Morris

18         got with me.

19   Q.    Okay.  So Mr. Barker contacted Jerry Morris

20         about your complaint, and Jerry talked to

21         you about it?

22   A.    Yeah.

23   Q.    Did you have a problem with the way it was

122

1      resolved or the way it was handled?

2  A.   I don't think it was handled quick enough,

3      and I think Mike retired -- I think they

4      let him stay -- I think they would have

5      fired him if it had been anybody else.

6      They let him stay there until he got his

7      retirement in.  I really think that

8      happened.

9  Q.   Do you know when he retired?

10  A.   No.  Some guys told me a few days ago.  I

11      don't know exactly.  Maybe in May or

12      something.  I don't know.

13  Q.   Do you know whether or not Mark Casillas

14      conducted 22 interviews in your department

15      during that month of January to investigate

16      your complaint?

17  A.   No.

18  Q.   Do you know if he conducted any interviews

19      with your co-workers about your complaint?

20  A.   No, I don't.

21  Q.   Do you know if he talked to Betty Smith

22      about the Laborer 3 interview?

23  A.   No.

123

1    Q.    Do you know if anyone confirmed your story

2          to Mark that Mike Strength put his feet in

3          your face during the meeting?

4    A.    No, I don't.

5    Q.    Do you know if any of your co-workers told

6          Mark that you were bossy and too difficult

7          to get along with?

8    A.    I had heard that -- I don't even know the

9          guy's name that went down to Mr. Casillas'

10         office when I was working in the mail room

11         and told him that I wasn't a team player or

12         something.

13   Q.    Who told you that?

14   A.    I can't recall.

15   Q.    After you had your meeting with Mr. Barker,

16         Mr. Todd, Mr. Casillas, Jerry Morris, did

17         you notice a change in the way that things

18         were done in Logistics or in your

19         department?

20   A.    After all those meetings, Jacky Todd

21         came -- they moved me over to the mail

22         room.  And I worked by myself for -- till I

23         got terminated from the job.

124

Q.   Is it true or false that Jacky Todd began
     handing out assignments to make sure that
     the work was being distributed evenly
     instead of Mike Strength?

A.   I don't know the answer to that.

Q.   And so after those meetings, you said that
     Mr. Todd moved you over to the mail room.

A.   Yes.

Q.   And did he approach you and ask you about
     taking it over or did he just move you?

A.   Well, he just came to me and asked me did I
     want to work in the mail room, drive the
     mail truck.  I said, yeah, I'll do it.

Q.   Did you ever tell him that you didn't want
     to work over there?

A.   No.

Q.   Did he tell you he thought you would be
     good in that position?

A.   Yes.

Q.   Did he ever mention anything about that
     would get you out of the warehouse?

A.   I can't recall that.

Q.   Okay.  And so when he first offered it, you

127

1   Q.  And the rest of the time, you are off on

2        your own, going to the different --

3   A.  I'd run a route, and he'd run a route.

4   Q.  Did you have any problems with what your

5        job duties were when you moved over to the

6        mail room?

7   A.  No.

8   Q.  I think you just mentioned something

9        about -- you said that Mr. -- or somebody

10       made some complaints about you not being a

11       team player, I think, to Mark Casillas.  Is

12       that what you just told me?

13   A.  Yes.  I think the two guys in the mail

14       room --

15   Q.  Who were they?

16   A.  I can't recall.  It was an older guy.

17   Q.  Who is Lee Walker?

18   A.  That's one of them.  I think he over the

19       mail room now.  And what's the older guy?

20   Q.  Was there a Matthew Sledge?

21   A.  Yeah, that's him.  They was friends --

22       Matthew Sledge is a 70 year-old man which

23       couldn't read that well.  Didn't know what

128

1       he was doing.  And Lee Walker is the white

2       guy, and he would help this guy.  So they

3       was friends all that time.  I didn't need

4       no help with that.

5  Q.  And Matthew Sledge, what's his race?

6  A.  Black.

7  Q.  What was his position?

8  A.  Mailman.  I mean, he just drive a mail

9       truck.

10  Q.  Okay.

11  A.  But he was an old guy.  He needed that.

12       And they became friends.  I didn't need

13       that help.  I didn't need you to read

14       nothing for me.  I don't need you to load

15       my mail bag.

16  Q.  Okay.

17  A.  And so that's how they end up down there to

18       what Lee --

19          This old lady was over the mail room.

20  Q.  Is that Ruth Simersky?

21  A.  Yeah.  And Lee Walker wanted to get -- I

22       was aggressive.  I could do any of it

23       because of the training I had.

131

```
 1   Q.   And he got Matthew Sledge to go down to
 2        Mark Casillas and say some stuff about you?
 3   A.   Yeah.
 4   Q.   Okay.  Do you recall a meeting shortly
 5        after you came to work in the mail -- work
 6        with the mail with you, Lee Walker, Ruth,
 7        Matthew, and Jacky Todd?
 8   A.   Yes.
 9   Q.   What was that meeting about?
10   A.   I've forgot.
11   Q.   Let me ask you if you remember this, and if
12        you don't, that's fine.  During that
13        meeting, did Matthew Sledge make the
14        statement that you weren't a team player or
15        words to that effect?
16   A.   Yes, that's what they say.
17   Q.   Okay.  Did he say that in front of you?
18   A.   He told Jacky Todd that.  And when we
19        got -- now, some of -- He had told Jacky
20        Todd.  They went into Jacky Todd's office,
21        and they had discussed it.
22             And when I -- When all of us went in
23        there, he said that I done got better.  And
```

132

1         I don't know what he meant by that.

2    Q.   He who said that?

3    A.   Sledge.  You know, I don't know what

4         they -- I never knew what they was talking

5         about.  I never knew what they want from

6         me, talking about a team player, because

7         all of this was individual work.

8    Q.   Okay.  I know you just said he said you got

9         better.

10   A.   Yeah, because they had made the statement

11        down to Mark Casillas that I wasn't a team

12        player.

13   Q.   Did he say in that meeting that you weren't

14        a team player?

15   A.   I can't recall that.  Only thing I can

16        recall, that he -- he said that -- I think

17        he said that I have gotten better.  And I

18        don't know what he meant by that because of

19        the fact there's nothing you could do.  I

20        mean, everybody is on their own.

21   Q.   Did you make the statement during that

22        meeting that you were used to working by

23        yourself because of the job that you had

136

1   Q.   The one where you worked for 19 years?

2   A.   Yes, working over there at the Board.

3   Q.   Do you remember talking about working for

4       19 years?

5   A.   No, I didn't discuss that.

6   Q.   Do you know how he knew that you had

7       another job where you worked for 19 years?

8   A.   I guess he knew from another guy, just like

9       I knew Mike Strength was a fireman.

10   Q.   A fireman?

11   A.   Yeah.  He retired from the fire department,

12       started working at the Board.

13   Q.   Before you came to the mail room, did you

14       have any problems with Tommie Williams?

15   A.   We had some words together.  We -- What had

16       happened, when I first came on board,

17       Mr. Dotson had told me that the people

18       thought we was one of the dumbest crews

19       around.  And I told him, I don't -- I can't

20       justify that.  And Tommie was one of these

21       people that can't write his name.

22       So we -- What happened, they had taken

23       an L-shaped desk aloose that goes in -- you

```
 1        know, L-shape.  Take it aloose, and we

 2        carried it over to Fairview West to

 3        Dr. Coleman's office -- to a doctor's

 4        office.

 5             And he couldn't figure out how to put

 6        the desk back together to fit it in the

 7        corner, and Dr. Coleman was going to show

 8        him.  And I told him, you know -- it was

 9        embarrassing.

10   Q.   Okay.

11   A.   You know, if you tell him about it -- What

12        happened, he had been there 13 years.  He

13        the one that had a key.  He the one that's

14        in charge.

15   Q.   Are you talking about Tommie?

16   A.   Yeah.

17   Q.   Okay.

18   A.   You know, that's the way they do things.

19        You know, you just coming on, you've got to

20        do what -- whether it's right or wrong.

21        And that's how -- that's what we -- He got

22        mad about that, because it was very, very

23        embarrassing to me to be at a doctor's
```

138

1          office, a professional person like that,

2          and you can't even put an L-shaped desk

3          back together and put it in a corner.

4    Q.    What was Tommie Williams' position?

5    A.    A Laborer 1 or something.

6    Q.    What was his race?

7    A.    Black.

8    Q.    Did you say something to Tommie about being

9          embarrassed about the situation at the

10         doctor's office?

11   A.    Yes.  I told him.

12   Q.    What did you --

13   A.    You know, I wanted to -- What happened,

14         when Dr. Coleman -- I just walked back

15         outside.  He had been there 13 years.  I'd

16         just got there.  It was an easy work task

17         to do.

18              And I told him, I said, you need to let

19         somebody help you and listen and you could

20         learn something, you know.  But 13 years

21         and I'd just got there, and he can't put a

22         desk back together, just a regular desk?

23   Q.    So all you said was, just let me help you?

1    A.    Tried to help him.  You know, this was on

2          several occasions.

3    Q.    Did he get angry with you?

4    A.    Yeah.  You see, he told me I couldn't work

5          with him.  He would go in there -- Like we

6          go into the school.  You supposed to go by

7          the office to sign in, and you're supposed

8          to address yourself.  He'd go in there

9          using slang words and things.

10   Q.    When did Tommie Williams say you can't work

11         with him?

12   A.    I don't recall.  We always worked together.

13   Q.    I thought you just said that he said he

14         told me I couldn't work with him.

15   A.    I guess he had told someone else in the

16         office that I couldn't work with -- you

17         know, I couldn't work with them or him or

18         something like that because of the way the

19         things was being done.  And I was, you

20         know, just voicing my opinion with --

21         amongst them.

22            It wasn't that -- I was trying to

23         correct the problem and help.  It wasn't

1    Q.    I don't know her race.

2    A.    I don't even know who she is.  But I think

3          she might be a black -- I might have spoke

4          to her or something, but that's it.  I

5          don't really know.

6    Q.    You don't recall any problem that you

7          had --

8    A.    No, I never talked with her.

9    Q.    -- when Ms. Meeks asked you to do something

10         and you said you weren't going to do it?

11   A.    What would she ask me to do?

12   Q.    I don't know.  I'm asking if you know.

13   A.    I don't know.  I don't recall.

14                     (Defendant's Exhibit 12 was marked

15                      for identification.)

16   Q.    We'll move on.  Let me show you what I've

17         marked as Exhibit 12 and tell me what that

18         is.

19   A.    What is this?

20   Q.    Is that your evaluation?

21   A.    Evaluation.

22   Q.    And who performed that evaluation?

23   A.    Donald Dotson's name is up here.

145

1    Q.    And on page one of that document, he gave

2          you satisfactories in all but one area

3          which was cooperation; is that correct?

4    A.    Uh-huh.  (Positive response.)

5    Q.    And cooperation is described as

6          consideration of other employees' work,

7          working with others, et cetera; is that

8          right?

9    A.    Yes.

10   Q.    Did he talk to you about your evaluation

11         when he did it?

12   A.    Yes.

13   Q.    Did he talk to you about that one area

14         where he said you needed improvement?

15   A.    Well, he mentioned it.  I'm quite sure he

16         mentioned it.  That's the only thing ...

17   Q.    Do you recall what he said about that?

18   A.    I just gave you an example.  All those guys

19         was incompetent peoples on the job.  It

20         just need rebuilding over there.  It's the

21         system situation.

22   Q.    Do you remember if he told you why he

23         marked you as needing improvement in that

1           area?

2    A.    No.

3    Q.    On page two of that document, he wrote:

4          Must work on issues that develop conflict

5          with other employees while on duty.  I have

6          seen much improvement lately.  Needs to

7          enhance communication and interpersonal

8          skills when working on tasks that require a

9          collaborative effort of manpower.  Is that

10         right?

11   A.    That was his opinion.

12   Q.    Okay.  Would it be fair to say that in his

13         opinion, you did not get along well with

14         your co-workers?

15   A.    I don't know what you call getting along.

16   Q.    I'm sorry.  I didn't understand you.

17   A.    No, I'm not saying that I don't get along.

18         I think I got along.

19   Q.    Okay.  Is it fair to say that in his

20         opinion, you had a problem in that area?

21   A.    In his eyesight.

22   Q.    Okay.  But you disagreed with that

23         assessment?

147

1    A.    Exactly.

2    Q.    Did you tell him that?

3    A.    He didn't ask that question.

4              (Defendant's Exhibit 13 was marked

5              for identification.)

6    Q.    Okay.  Let me show you what I've marked as

7          Exhibit 13 which is your January '04

8          evaluation, and that was performed by

9          Mr. Todd, right?

10   A.    Uh-huh.  (Positive response.)

11   Q.    And is it correct that he also felt you

12         needed improvement in the area of

13         cooperation?

14   A.    I think it just was a copy of -- I think he

15         just copied Mr. Dotson's evaluation.  I

16         mean, that -- Yes.

17   Q.    Thank you.  And he also said that you

18         needed improvement in the area of

19         acceptance of constructive criticism

20         and interest; is that correct?

21   A.    Yes.

22   Q.    Did he talk with you about that?

23   A.    He just discussed what he ...

148

1    Q.    What did he say?

2    A.    He said where the N's are at, we need to

3          work on those problems.  I said okay and

4          signed it and left.

5    Q.    That's all there was to that?

6    A.    Yeah.

7    Q.    Did you agree with his assessment?

8    A.    No.

9    Q.    Did you agree with his assessment that you

10         were satisfactory in all other areas?

11   A.    Yes.  I mean, like I said, I just feel like

12         that he just copied off Mr. Dotson's.

13         That's the only thing I think.

14   Q.    Do you know any reason why he would do

15         that?

16   A.    Yeah, because of these problems, probably

17         what they had coming up for me.

18   Q.    But he marked you satisfactory in the

19         majority of the areas; is that correct?

20   A.    Yeah.

21   Q.    Do you believe that Mr. Todd was out to get

22         you?

23   A.    I mean, I got terminated, and they hired

151

1       ugly about this man and woman that were

2       released when you were released?

3    A.   No.

4    Q.   But you got along with them pretty well?

5    A.   Yes.

6                    (Defendant's Exhibit 14 was marked

7                    for identification.)

8    Q.   Let me show you what I've marked as Exhibit

9        14, which is your May 5th, 2004 evaluation

10       also performed by Mr. Todd?

11           Yes?

12   A.   Yes.

13   Q.   Okay.  And, again, he felt you needed

14       improvement in the areas of cooperation as

15       well as acceptance of constructive

16       criticism; is that correct?

17   A.   Yes.

18   Q.   But he did not -- He marked you

19       satisfactory in the area of interest where

20       he had marked you needs improvement on your

21       previous evaluation; is that correct?

22   A.   Yes.

23   Q.   Okay.  Did he talk with you about your

154

1    Q.    Do you think he thought that you were the

2          best person for that position?

3    A.    I would think so, the best qualified -- I

4          mean, I would have been the best qualified

5          person or I wouldn't have applied for the

6          job.

7    Q.    Okay.

8    A.    That's just like me going to apply for a

9          Laborer 4 or 5 job.  I'm not going to

10         qualify for the job because it's a

11         technician job.

12   Q.    Are you saying that Ronnie Causey was

13         disqualified for the job?

14   A.    All he do is clean up.  He don't have -- I

15         don't know if he even have a high school

16         degree.  I don't know that.

17   Q.    Do you know if Ronnie Causey was

18         unqualified for that job?  I understand you

19         think you were better qualified.  Do you

20         know that he was unqualified?

21   A.    I don't know the answer to that.

22   Q.    Okay.  How did you find out that you were

23         going to be non-renewed?

155

1   A.   The morning when I walked in.

2   Q.   Do you know if Mr. Strength made the

3        decision to non-renew you?

4   A.   No, I don't.

5   Q.   Do you believe he did?

6   A.   He had something to do with it.

7   Q.   How do you know that?

8   A.   No question it was discussed between them.

9   Q.   Do you know?

10  A.   I don't know.

11  Q.   Is it your understanding that Mr. Todd was

12       the one that made the recommendation to

13       Dr. Carter as to who was going to be

14       nominated in Logistics?

15  A.   I'm quite sure.

16  Q.   Okay.  And is it your understanding that

17       Dr. Carter made the recommendation to the

18       Board as to who should be nominated in the

19       school system?

20  A.   I guess.

21  Q.   Okay.  And your understanding is that the

22       Board approved those recommendations?

23  A.   Yes.

1    Q.    And we've already talked about that you

2          agreed that it was their right to do that

3          as long as it wasn't for an illegal

4          reason.

5    A.    Yes.

6                      (Defendant's Exhibit 15 was marked

7                       for identification.)

8    Q.    Let me show you what I've marked as Exhibit

9          15, and you said that you received that

10         letter when you arrived at work one

11         morning.

12   A.    Uh-huh.  (Positive response.)

13   Q.    I'm sorry?

14   A.    Yes.

15   Q.    And was it June 25th?  Do you remember if

16         the letter was dated the same day that you

17         got it?

18   A.    Well, it's got education meeting -- the

19         meeting was June the 24th.

20   Q.    Okay.

21   A.    But it was effective July -- well, I think

22         they paid me like a few -- As a matter of

23         fact, you know, he paid me a few weeks on,

157

1    and I think --

2         It was effective, what?  June the

3    24th.  I know he paid me for a couple more

4    weeks or something.

5  Q.  Did you continue to work?

6  A.  No.

7  Q.  Did anybody tell you that you were being

8    non-renewed because you were black?

9  A.  No.

10 Q.  Did anybody tell you you were being

11   non-renewed because you had made

12   complaints?

13 A.  No.

14 Q.  What evidence besides your beliefs do you

15   have that you were non-renewed because of

16   your race?

17 A.  What evidence?

18 Q.  Do you believe you were non-renewed because

19   you're black?

20 A.  Yes.

21 Q.  Okay.  And what evidence do you have that

22   that was the case?

23 A.  Oh, no.

1    Q.   Go ahead.

2    A.   No, no.  I want to strike that.

3    Q.   I'm sorry?

4    A.   No, I don't want to answer that.  I don't

5         know the answer to that.

6    Q.   Do you believe that you were non-renewed

7         because you're black?  You don't want to

8         answer to that one?

9    A.   No.

10   Q.   You claim in your lawsuit that that was one

11        of the reasons that you were non-renewed.

12        Were you aware of that?

13   A.   Yes.

14   Q.   Do you believe that you were non-renewed

15        because you were black?  Do you think that

16        was one of the reasons?

17   A.   Yes.

18   Q.   And do you have any evidence to support

19        that belief?

20   A.   I don't know.

21   Q.   Do you have any evidence that you were

22        non-renewed because of your complaints that

23        you made?

159

1   A.   I don't know that.

2   Q.   But you do agree that both black or white

3       co-workers went and made complaints about

4       you?  Whether or not you believe they were

5       true, do you believe that that happened?

6   A.   I don't know.  I mean, how would I know?  I

7       mean, I know what you just said.

8   Q.   I thought you told me that you knew that

9       Lee --

10   A.   No, I don't know that, but I felt like

11       that's what happened.  I don't know that he

12       went there.

13   Q.   Okay.

14   A.   That's the only way -- I mean, I don't know

15       if he did that because I didn't see him do

16       it.

17   Q.   Did Mark Casillas tell you that Lee Walker

18       and Matthew Sledge came to see him about

19       you not being a team player?  Because I

20       didn't know that.  Where did you get that

21       information from?  I got that from you.

22   A.   Either Mark told me that or Jacky told me

23       that.  Somebody told me that.  I don't

160

1     know.

2   Q.  Do you have any reason to disbelieve the

3     statement that your co-workers complained

4     to your superiors about you?  I know that

5     you wouldn't have been in the room when it

6     happened, but do you believe that it

7     happened at all?

8   A.  I don't know.  I don't know.

9   Q.  Your complaint says that you're suing the

10     Board for race discrimination and

11     wantonness, for training and supervision.

12     Who do you believe was improperly trained

13     and supervised?

14   A.  I believe Mike Strength was.

15   Q.  And who improperly trained him and

16     supervised him?

17   A.  I don't think he had training.

18   Q.  And whose fault was that?

19   A.  The Board.

20   Q.  Anybody else?

21   A.  No, that's all.

22   Q.  Jacky Todd?

23   A.  He's just a director.  The Board hired

161

1          him.   Jacky Todd didn't hire him.

2     Q.   Okay.   Jimmy Barker?

3     A.   Jimmy Barker hired him.

4     Q.   Okay.   Mark Casillas?

5     A.   That's the personnel director, yes.

6     Q.   And we've already talked about this.   The

7          only positions you didn't get besides

8          Laborer 3 in November was the Laborer 2

9          before that.   Are those the only two

10         positions that you applied for that you

11         didn't get because of your race?

12    A.   Yes.

13    Q.   I'm sorry?

14    A.   Yes.

15    Q.   Is there anything besides the Laborer 2,

16         Laborer 3, Mike Strength making you do

17         things that you did not think were right,

18         anything else that's a part of your claim

19         of race discrimination?

20    A.   No.

21    Q.   Do you know Carlinda Purcell?

22    A.   Yes.  Well, not personally.

23    Q.   Has she done anything to you personally

```
 1         that you're suing her for, or are you just
 2         suing her because she's the new
 3         superintendent?
 4    A.   No.
 5    Q.   She hasn't done anything to you personally?
 6    A.   She hasn't done anything.
 7    Q.   Okay.  And you know Jimmy Barker?
 8    A.   Yes.
 9    Q.   And why are you -- What did he do that you
10         thought was wrong?
11    A.   Well, he lied to me about the interview.
12    Q.   I thought you told me that he didn't know
13         about the interview.
14    A.   No.  He knew about the interview -- I'm
15         getting my days mixed up.  He knew about
16         the interview --
17    Q.   Let me see if I can jog your memory.  You
18         had a Laborer 2 interview -- I'm sorry.
19         You had a Laborer 2 application, and you
20         didn't get an interview for it.
21            You and Jerry Morris went and talked to
22         Jimmy Barker, and Jimmy Barker told you
23         that he wanted to make sure everything was
```

1   because he didn't know.

2 Q. Okay.  Did he ever refuse to meet with you

3   or Jerry when you wanted to talk about

4   whatever problems you were having?

5 A. No.

6 Q. Was he ever rude or disrespectful to you?

7 A. No.

8 Q. And Mark Casillas, what did he do that you

9   didn't like?

10 A. Oh, I applied for different jobs and he

11   never would consider me.  I even applied

12   for a custodian job, and he never would

13   return any call.  They'd always say he was

14   out of the office.  I'd stop by to talk to

15   him, and he never got back with me.

16 Q. Was he ever rude or disrespectful to you?

17 A. No.

18 Q. What about Jacky Todd?  I know about the

19   Laborer 3 position.  I know about the

20   Laborer 2 position.  What else did he do

21   that you didn't like?

22 A. Well, he conducted --

23 Q. And the non-renewal, of course.

165

```
 1   A.   Well, he could have let me go on and --

 2        when he could have corrected me -- I mean,

 3        he could have corrected the problem before

 4        he -- he had all these meetings.  I think

 5        he could have just met with me and see.

 6             But it was like he got his team

 7        together and then bring me in like I'm on

 8        trial.  I don't think he handled that

 9        right.

10   Q.   Okay.  But he never said anything --

11   A.   Verbal.

12   Q.   He never called your name, though, did he?

13   A.   No.

14   Q.   Did he write you up?

15   A.   No.

16   Q.   I think you're talking about the meeting

17        where --

18   A.   I've never been wrote up.

19   Q.   And Mike Strength, I think we've covered

20        pretty much that he gave you assignments

21        that you did not think were appropriate.

22   A.   Uh-huh.  (Positive response.)

23   Q.   You told me about a couple of comments that
```

166

1      he made in your presence.  Is there

2      anything else that we haven't talked about

3      that you didn't like that you think Mike

4      Strength did?

5  A.   No.

6  Q.   And is there anything else that anybody on

7      the Board did that you thought was

8      inappropriate and that you would be suing

9      us for?

10 A.   No.

11              MS. HARRELL:  I'm very close to

12                  being finished.  I promise.

13 A.   I have a question.  Can I ask a question?

14     Martha Meeks --

15              MS. BATTLE-HODGE:  Just let her

16                  ask and you just answer.

17 Q.   Tell me how you've been affected by what

18     the Board or any of these defendants that

19     you've sued have done to you.

20 A.   Well, first of all, when I -- when all

21     these allegations and different things was

22     going around and I wasn't getting good

23     results, I began to get -- I got high blood

171

1  A.  Yes.

2  Q.  You disagree that you had problems with

3      both white and black co-workers --

4  A.  Yes.

5  Q.  -- while you were working at the Board?

6  A.  Yes.

7  Q.  Do you agree or disagree that you worked

8      better on an individual basis than with a

9      group of people?

10 A.  I could work under any circumstance.

11 Q.  Do you have a preference?

12 A.  No.

13 Q.  Do you agree or disagree that it's

14     important for an employee to get along with

15     his co-workers?

16 A.  Yes.

17             MS. HARRELL:  Those are all my

18                 questions.

19                     Anything?

20             MS. BATTLE-HODGE:  Nothing.  Thank

21                 you.

22             MS. HARRELL:  Thank you,

23                 Mr. Garrison.