IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| BOBBY GARRISON, | : | |
| | : | |
| PLAINTIFF, | : | |
| | : | |
| -VS- | : | CASE NO. 2:05-CV-549-A |
| | : | |
| MONTGOMERY COUNTY BOARD | : | |
| OF EDUCATION, CARLINDA PURCELL, | : | |
| JIMMY BARKER, JACKY TODD, MARK | : | |
| CASILLAS AND MIKE STRENGTH, | : | |
| | : | |
| DEFENDANTS. | : | |

MEMORANDUM BRIEF IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COME NOW the Montgomery County Board of Education, Carlinda Purcell, Jimmy Barker, Mark Casillas, Jacky Todd and Mike Strength, Defendants in the above-styled cause, and submit the following Memorandum Brief in Support of their Motion for Summary Judgment.

## I.    SUMMARY OF THE CASE

This is a race discrimination case. Plaintiff Bobby Garrison (hereinafter "Garrison") brought this action against the Montgomery County Board of Education (hereinafter "the Board"), Carlinda Purcell, in her official capacity as Superintendent of the Board, Jimmy Barker, in both his individual and official capacities as Assistant Superintendent for the Board, Jacky Todd, in both his individual and official capacities as Director of Logistics for the Board, Mark Casillas in both his individual and official capacities as Director of Support Personnel for the Board and Mike Strength in both his individual and official capacities as a Logistics supervisor for the Board.

Garrison alleges causes of action pursuant to 42 U.S.C. §1983, Title VII and wantonness relating to his failure to obtain a promotion, a hostile work environment and nonrenewal of his

employment contract. The Defendants filed an Answer asserting various affirmative defenses and following discovery, this motion is now ripe for consideration.

## II.  SUMMARY OF UNDISPUTED FACTS

### A.  THE PARTIES

#### 1.  PLAINTIFF

Bobby Garrison is a black male.  (See Exhibit "1"-Deposition of Bobby Garrison p. 8 at lines 2-3).  In March 2002, he applied for the position of Laborer I and was hired by the Board effective April 15, 2002.  (Garrison Depo. p. 24 at lines 2-9; See Exhibit "2"-Appointment Letter).  At all times, Garrison was a nontenured employee with the Board.  (Garrison Depo. p. 26 at lines 21-23).

#### 2.  DEFENDANTS

The Board is the legal entity charged with "the general administration and supervision of the public schools" in Montgomery County pursuant to state statute.  See *Ala. Code* §16-8-8 (1975). Carlinda Purcell has been the Superintendent of the Board since December 2004. (See Exhibit "3"-Affidavit of Mark Casillas ¶4). At all times relevant to this suit, Clinton Carter was Superintendent of the Board. (Id.)

At all times relevant to this suit, Jimmy Barker (hereinafter "Barker") has been Assistant Superintendent of Human Resources for the Board.  (Casillas Aff. ¶5).  Barker is a black male. (Id.).

At all times relevant to this suit, Mark Casillas (hereinafter "Casillas") was a Support Personnel Specialist for the Board. (Casillas Aff. ¶2).  Casillas is a Hispanic male.  (Casillas Aff. ¶1).

Jacky Todd (hereinafter "Todd") has been the Director of the Logistics Department for the Board since July 28, 2003.  (See Exhibit "4"-Affidavit of Jacky Todd ¶2).  Todd is a white male. (Todd Aff. ¶1).  From October 1999 until July 2003, Donald Dotson (hereinafter "Dotson") was

Director of Logistics.  (Casillas Aff. ¶6).  Dotson, a black male, left Logistics when he was made Director of Career and Technical Education in July 2003.  (Id.; See Exhibit "5"-June 11, 2003 Board Minutes)

Mike Strength (hereinafter "Strength") was a supervisor in Logistics until his retirement in May 2005.  (Todd Aff. ¶4).  Strength is a white male. (Id.)

### B.    GARRISON'S CLAIMS

In his *Complaint*, Garrison makes various allegations against the Defendants:

#### 1.    GARRISON'S HIRE AS A LABORER I

Garrison claims in his *Complaint* that he was improperly hired as a Laborer I.  (*Complaint* ¶19).  However, in his deposition testimony, Garrison concedes that he applied for the position of Laborer I.  (Garrison Depo. p. 24 at lines 2-9, p. 25 at lines 11-16).  He further testifies that he did not have a problem with being hired as a Laborer I. (Garrison Depo. p. 25 at lines 21-23).  Dotson was the Director of Logistics and Garrison's immediate supervisor from April 2002 until July 2003 when Dotson moved into a new position.  (Garrison Depo. p. 29 at lines 16-22; Casillas Aff. ¶6).  Dotson interviewed Garrison, evaluated him and gave him assignments during that first year of his employment.  (Garrison Depo. p. 25 at lines 19-20, p. 29 at line 16-p. 30 at line 2).

#### 2.    DEGRADING AND DEMORALIZING TASKS AND TREATMENT

Garrison claims that he was made to do degrading and demoralizing tasks because of his race. (Complaint ¶¶14,17,18).  Garrison agrees that the Laborer I Position Announcement posted in February 2004 was similar to the one that would have been posted for the position for which he was hired.  (Garrison Depo. p. 27 at line 17-p. 29 at line 6; See Exhibit "6"-Position Announcement for Laborer I).  That posting contains duties such as operating walking or riding mowers, maintaining the warehouse area, and "any other duties within operations as directed".  (Position Announcement):

> Q.    Was it kind of whatever needs to be done?  Is that fair to say?
> **A.    Yes.**

(Garrison Depo. p. 28 at lines 2-4).

Despite that acknowledgment, Garrison claims that Strength assigned him degrading and demoralizing tasks such as cutting grass, washing cars and picking up paper when work was slow around the warehouse.  (Garrison Depo. p. 29 at lines 5-13, p. 77 at lines 12-23, p. 90 at lines 2-7). He specifically reported an incident to Barker wherein Strength said "get out there and wash my car and wash Jacky Todd's car, too." (Garrison Depo. p. 78 at line 19-p. 79 at line 1; See Exhibit "7"-December 1, 2003 Letter to Jimmy Barker).  Garrison concedes that both Strength and Todd drove Board vehicles and that those were the vehicles he was being instructed to wash.  (Garrison Depo. p. 80 at lines 8-14). He also concedes that he had to wash Dotson's car which was also a Board vehicle.  (Garrison Depo. p. 79 at lines 2-6, p. 80 at lines 8-14).  He testified as follows:

> Q.    And you thought it was demoralizing to be asked to wash a Board vehicle by your supervisor?
> **A.    Well, it wasn't a responsibility.  It wasn't – it was not a requirement to wash –**
> **I didn't say that was demoralizing.  I'm saying it wasn't required to be done as a Laborer 1.  I mean, nowhere in [the Job Description] that, you're going to see where it's – in the Laborer 1 structure that you have to a wash a car.**
> *           *           *
> Q.    So you consider it demoralizing to wash a car?
> **A.    Yes.**
> Q.    Because it wasn't listed as a job responsibility; is that –
> **A.    It was not a responsibility.**
> Q.    And who should have been washing the cars do you think?
> **A.    He should have kept his own car washed.**
> Q.    Wasn't that a Board vehicle?
> **A.    Yes.**

(Garrison Depo. p. 80 at line 15-p. 82 at line 9).

Regarding the grass cutting, "some guy would come out there with a big tractor and cut the whole field.  But then [Strength] would have me out there cutting grass when they didn't show up."

4

(Garrison Depo. p. 85 at lines 12-16).  Garrison thought it was demoralizing to be made to cut the grass with a push mower because the Board has a grass crew.  (Garrison Depo. p. 86 at lines 11-22). He believes this was also because he was black.  (Garrison Depo. p. 86 at line 23-p. 87 at line 2).

Garrison also took issue with being told to pick up paper and other objects. (Garrison Depo. p. 91 at lines 1-8):

> Q.     What was demoralizing about having to pick up paper?
> **A.     Well, we weren't only picking up paper.  We were walking around picking up cigarette butts and everything. In my eyesight and everything, I would just rather go home than just walk around outside picking up paper.  It wasn't – It wasn't necessary.**

(Garrison Depo. p. 91 at lines 1-8).

Garrison concedes that he was assigned these same type of tasks under Dotson's tenure. (Garrison Depo. p. 92 at lines 14-17).

Garrison alleges that he never saw white employees washing cars or cutting grass, but also estimates that 95% of laborers were black.  (Garrison Depo. p. 82 at line 10-p. 83 at line 3). Garrison's union representative Jerry Morris told Garrison that it was not his job to cut grass, pick up paper in the warehouse and wash cars when work was slow at the warehouse.  (Garrison Depo. p. 90 at lines 2-16).   Garrison concedes that it was not Morris' responsibility to make work assignments in Logistics, but rather that of the supervisor and director.  (Garrison Depo. p. 90 at lines 17-23).  Strength never told Garrison that he was made to do those tasks because of his race. (Garrison Depo. p. 83 at lines 4-9).  Garrison's evidence that this was required because he was black was that Strength was white, his boss and "in [Strength's] eyesight, I feel like he felt that's what I should be doing."  (Garrison Depo. p. 84 at lines 3-20).

Garrison also claims that he and two other black employers had to remove computers from an elementary school basement that had a busted sewage pipe.  (Garrison Depo. p. 78 at lines 1-

8).  Garrison acknowledges that Strength distributed the orders that came from the directors, whether Dotson or Todd.  (Garrison Depo. p. 79 at line 11-p. 80 at line 7).  Dotson was director at the time of this task.  (Garrison Depo. p. 87 at lines 3-10).  Upon further questioning, Garrison reveals that he did not have a problem with the task, but says that the conditions should have been improved before sending him in to remove the computers.  (Garrison Depo. p. 88 at line 13-p. 89 at line 8).  He admits that they were provided with rubber boots and jump suits to keep their clothes from being ruined.  (Garrison Depo. p. 89 at lines 9-16).

Garrison also alleges that Strength made "racial statements".  (Garrison Depo. p. 73 at line 20-p. 74 at line 1).  He alleges that, during Dotson's tenure [which ended in July 2003], Strength referred to a black employee as a "monkey" when speaking to another (presumably white) employee.  (Garrison Depo. p. 74 at lines 2-22).  Garrison alleges that he and other employees reported it to Dotson who "didn't do anything about it", but responded "well, [Strength] going to hurt hisself eventually."  (Garrison Depo. p. 74 at line 23-p. 75 at line 10).  Garrison did not have a problem with Dotson's response.  (Garrison Depo. p. 75 at lines 13-15).  Garrison also claims that Strength made another racist statement after a fire extinguisher mishap  that "all of you-all was standing out here and didn't see nobody skeet the foam out of the fire hose?"  (Garrison Depo. p. 75 at line 16-p. 76 at line 13).  Garrison considered the phrase "you all" racist because "[t]here was nothing but blacks [standing] out there."  (Garrison Depo. p. 76 at lines 14-18).  This incident also occurred during Dotson's tenure, but it was not reported.  (Garrison Depo. p. 76 at lines 19-23).  These two statements were the only "racist" statements made by Strength.  (Garrison Depo. p. 77 at lines 1-3, p. 103 at line 23-p. 104 at line 5).  Neither statement was reported to Barker or mentioned in Garrison's December 1, 2003 letter to Barker.  (Garrison Depo. p. 77 at lines 4-7; December 1, 2003 Letter).

Garrison claims that Strength propped his foot up on a little stool that was maybe a foot off the floor [close to Garrison's face] during a meeting with other employees in a disrespectful manner. (Garrison Depo. p. 93 at line 8-p. 97 at line 9). This incident was not a basis of Garrison's *Complaint* but was included in his December 1, 2003 letter to Jimmy Barker. (December 1, 2003 Letter). He also testified that he believed Strength attempted to entice him to steal some garbage bags, also during Dotson's tenure. (Garrison Depo. p. 105 at line 3-p. 106 at line 20).[1]

He also took issue with Strength's direction that he and other employees record serial numbers off of computers in a manner contrary to the way Dotson had them do when he was Director. (Garrison Depo. p. 108 at line 8-p. 114 at line 23). He drafted a memo regarding the December 9, 2003 incident to Todd. (See Exhibit "8"-December 11, 2003 Memo to Jacky Todd). There was no mention of race during this incident. (Garrison Depo. p. 115 at lines 1-7).[2]

"Whites [sic] employees are allowed, Mike Strength in particular, to demoralize black workers on a daily basis." (*Complaint* ¶15). Garrison testified that the white employee he was referring to, "Lewis", would call a black employee a "drunkard" or "alcoholic", possibly as a joke between the two men, but Garrison did not consider it funny. (Garrison Depo. p. 99 at line 13-p. 102 at line 6). Also on this issue, Causey would tease Garrison about being his boss. (Garrison Depo. p. 102 at lines 7-18). He never heard either man use a racial slur. (Garrison Depo. p. 103 at lines 10-22).

---

[1] Inasmuch as these allegations were not included in Plaintiff's *Complaint*, Defendants assert this allegation is not properly before the Court. See *Sweeney v. State of Ala. Alcoholic Beverage Control Bd.*, 94 F.Supp.2d 124, 1270 (M.D. Ala. 2000)(stating where claims not raised or even alluded to in a complaint, "complaint may not be amended by statements in a deposition."), opinion vacated and superceded on other grounds by *Sweeney v. State of Ala. Alcoholic Beverage Control Bd.*, 117 F.Supp.2d 1266 (M.D. Ala. 2000)(citing *Fed.R.Civ.P.* 15(a); *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996); *Kansas Mun. Gas Agency v. Vesta Energy Co.*, 840 F.Supp. 814, 821 (D.Kan. 1993)).

[2] See Footnote 1, supra.

Garrison believes that the Board, Barker and Casillas improperly trained Strength. (Garrison Depo. p. 160 at line 9-p. 161 at line 5).  He does not allege that cause of action against any other defendant.

### 3.    IMPROPER REPRIMAND

Garrison further claims that he was improperly reprimanded by Todd in front of other employees. (*Complaint* ¶16).  Garrison claims that on August 12, 2003, after returning to the warehouse, he was told by Joe Allen, a black coworker, that "we've got to have a meeting and it's because of you."  (Garrison Depo. p. 37 at lines 3-22, p. 39 at lines 11-23).  He, along with three other employees, went into Todd's office together  where Todd was already seated with Strength. (Garrison Depo. p. 40 at line 15-p. 41 at line 1).  During the meeting, Todd said that someone was making comments about race in the department, and that if anybody brought up race, he would "terminate them right then."  (Garrison Depo. p. 41 at lines 2-8). Garrison admits that Todd did not mention "race discrimination" or "race discrimination complaints" during the meeting, but rather "race".  (Garrison Depo. p. 41 at line 9-p. 42 at line 3, p. 45 at line 21-p. 46 at line 10).[3]

---

[3]Garrison **felt** Todd was trying to prevent him from making a race discrimination complaint, but admits Todd never made such a statement:

> Q.    Okay.  Did he say that comments about race were inappropriate or any words to that effect?
>
> **A.    Well, the way I took it is, it was inappropriate to me, I mean, because the way it was stated to me, that if you make – say anything about any kind of race or discrimination, you will be terminated.**
>
> Q.    Did he say discrimination or is that your word?
>
> **A.    It was race.**
>
> Q.    Okay.  Well, did he say what he was talking about, what he was referring to?  Did he say somebody was making discrimination complaints?
>
> **A.    No, no, no.  See, what had happened, Ronnie Cosby [sic] and I had had some words out on the dock, and so that's where that led to.**
>
> \*    \*    \*

(continued...)

Garrison testified that he believed the meeting arose out of a confrontation he had with Ronnie Causey, a white employee, earlier that day but admits that race was never mentioned during the argument.  (Garrison Depo. p. 38 at lines 10-16, p. 42 at lines 1-13, p. 43 at lines 3-8). Garrison believes the employees, including Joe Allen, "planned the meeting before [he] got there". (Garrison Depo. p. 42 at lines 14-21, p. 43 at line 18-p. 44 at line 10).  He felt that Todd brought up race because he did not want to appear to take sides with Causey.  (Garrison Depo. p. 45 at lines 8-18).

Garrison testified that during the meeting, Causey, who was a Laborer II, raised the issue of the confrontation with Garrison earlier in the day.  (Garrison Depo. p. 49 at line 18-p. 51 at line 18).  Causey apparently believed that Garrison should follow his orders, but Garrison did not agree:

> Q.   Did Ronnie Causey say your name in that meeting?
> **A.   Yes, he called my name.**
> Q.   And when he said something about you, you then said that you weren't going to do what he said because he was only a Level 2?
> **A.   Yes, he's not a supervisor.**

(Garrison Depo. p. 51 at lines 16-22).

While Garrison testified that Todd, who was sitting across from him, maintained eye contact with him, Garrison states that Todd never mentioned him or any employee by name.  (Garrison

---

[3](...continued)

> Q.   Did Mr. Todd say the comments about race would not be tolerated or words to that effect?
> **A.   If anybody make any kind of racial, then I will determine – I will terminate them right them. <u>In other words</u>, he was telling me if I said that you was being prejudiced because Ronnie came in here and told you this, that's what that was.**
> Q.   Are you saying that's how you took it or that's what he said?
> **A.   He said – He said if anybody say anything about race, he would terminate them."**

(Garrison Depo. p. 41 at line 9-p. 42 at lines 3, p. 45 at line 21-p. 46 at line 10)(Emphasis added).

Depo. p. 47 at lines 8-20, p. 165 at lines 1-13, p. 166 at lines 6-13). Despite this fact, he felt he was being reprimanded. (Garrison Depo. p. 52 at lines 5-14). He agrees that it is inappropriate to make comments about race in the workplace. (Garrison Depo. p. 49 at lines 5-7). He also agrees that if complaints are made about such comments, it is appropriate for a supervisor to call a meeting to discuss it. (Garrison Depo. p. 49 at lines 12-17).

Following this meeting, Garrison drafted a letter to Todd complaining about statements Todd made during the meeting.[4] (See Exhibit "9"-August 12, 2003 Letter to Jacky Todd). Todd never discussed the letter with Garrison nor did he report Garrison to Jimmy Barker or Human Resources. (Garrison Depo. p. 55 at lines 2-11). Todd also did not write Garrison up for the incident with Causey. (Garrison Depo. p. 165 at lines 14-18).

### 4. PROMOTION TO LABORER III

Garrison also claims that he did not receive a promotion because of his race. (*Complaint* ¶20). He makes the general allegation that "whites are hired and promoted over blacks no matter how inexperienced they are." (*Complaint* ¶15). He clarifies in his deposition that he is referring to the November 2003 promotion of Ronnie Causey. (Garrison Depo. p. 108 at lines 2-5). In November 2003, Garrison applied for the position of Laborer III. (Garrison Depo. p. 55 at lines 12-20, p. 57 at lines 16-20). The person hired for this position would be working mainly with science kits. (Garrison Depo. p. 56 at lines 5-15, p. 57 at lines 8-11; Todd Aff. ¶5). No one prevented him from applying and he received an interview. (Garrison Depo. p. 57 at lines 12-15). He complains that he was "startled" to arrive at work one morning and be sent in for an interview. (Garrison Depo. p. 57 at lines 16-20). He was interviewed by Todd, Strength and Betty Smith, a black female, who was the secretary at Logistics. (Garrison Depo. p. 57 at line 21-p. 58 at line 13). He

---

[4]During his testimony, Garrison concedes that some of the statements he attributed to and accusations he made against Todd in the letter were mistakes. (Garrison Depo. p. 53 at line 14-p. 54 at line 21).

does not know if the other employees who applied were interviewed as soon as they reported to work. (Garrison Depo. p. 59 at lines 10-15). Employees Lewis Gunter, who was already a Laborer III, and Causey, who was a Laborer II, also applied for the job and were interviewed in the same fashion as Garrison. (Todd Aff. ¶5).

Causey was already working mainly with the science kits, was qualified and was deemed the best fit for the position by the committee.[5] (Todd Aff. ¶5). The only black member of the interview committee ranked Garrison lowest among the three candidates. (Casillas Aff. ¶7; See Exhibit "10"-February 9, 2004 Investigation Memo by Mark Casillas). No one told Garrison that he could not have that position because he was black or that they needed a white person for the position. (Garrison Depo. p. 64 at lines 7-15).

Garrison's evidence that he was not given that position because of his race is that Causey was hired and that Causey was not qualified for the position. (Garrison Depo. p. 64 at line 16-p. 65 at line 12). Garrison concedes that he does not know whether Causey was qualfiied or unqualified for the position. (Garrison Depo. p. 154 at lines 17-21). Garrison appealed the incident to Barker. (Garrison Depo. p. 65 at line 23-p. 66 at line 8; December 1, 2003 Letter).

### 5.    CORRECTIVE MEASURES

Garrison claims Barker, Casillas and Todd failed to prevent the discrimination in Logistics. (*Complaint* ¶¶14, 22, 23). Garrison had at least two meetings with Barker and his union representative Jerry Morris, one involving a complaint about a Laborer II position he did not get and a second involving the Laborer III position in November 2003.[6] (Garrison Depo. p. 69 at line 3-21,

---

[5]Garrison equivocates about Causey's prior involvement with science kits during his testimony, despite the statement in his *Complaint* that "Causey is a white employee who had been hired to work at Logistics as a Laborer II with science kits" when discussing the August 2003 incident. (*Complaint* ¶16; Garrison Depo. p. 61 at line 21-p. 63 at line 22).

[6]Garrison does not make any claim regarding the preceding Laborer II position which he
(continued...)

p. 116 at lines 7-23). Each time, Garrison felt Barker was respectful of him and listened to his concerns. (Garrison Depo. p. 71 at lines 1-6). Barker was never rude or disrespectful to Garrison. (Garrison Depo. p. 164 at lines 6-7). Garrison claims that Barker lied to him when he promised to be present for his Laborer III interview, but concedes that Barker did not know that the interview was taking place and, therefore, "in that perspective", did not lie to him. (Garrison Depo. p. 162 at line 7-p. 164 at line 1). Barker never refused to meet with Garrison or Morris when Garrison was having problems. (Garrison Depo. p. 164 at lines 2-5).

In response to Garrison's December 2003 letter to Barker, a meeting was held on January 7, 2004 with Garrison, Jerry Morris, Jimmy Barker, Mark Casillas and Jacky Todd. (Garrison Depo. p. 115 at line 8-p. 116 at line 6, p. 118 at lines 8-13). None of the men were disrespectful to Garrison during the meeting and they listened to what he had to say. (Garrison Depo. p. 118 at line 17-p. 119 at line 12). Barker told Garrison to give him two weeks and that he would get back to him. (Garrison Depo. p. 121 at lines 7-12). Barker contacted Morris, but Garrison believes it took longer than two weeks. (Garrison Depo. p. 121 at lines 7-22). Garrison believes Barker called Strength down to Central Office, that Strength admitted to some of Garrison's allegations and that Strength received a verbal or written warning. (Garrison Depo. p. 120 at line 2-p. 121 at line 6). Garrison does not believe his complaint was handled quickly enough and complains that Strength was permitted to retire. (Garrison Depo. p. 121 at line 23-p. 122 at line 8).

In response to Garrison's December 2003 letter, Casillas conducted twenty-two interviews in Logistics during the month of January 2004. (Casillas Aff. ¶7). Fourteen of the employees Casillas spoke to were African-American. (Id.) The result of Casillas' investigation revealed that Strength had an abrupt and aggressive tone with both black and white employees in Logistics, but

---

[6](...continued)
says he applied for and did not receive sometime between April 2003 and November 2003. (Garrison Depo. p. 68 at lines 10-18, p. 70 at lines 7-22).

also that both black and white employees felt that Garrison was bossy, difficult to work with and got into a number of disagreements with his coworkers. (Casillas Aff. ¶7; February 9, 2004 Investigation Memo). Casillas was never rude or disrespectful to Garrison. (Garrison Depo. p. 164 at lines 6-17).

After the January 2004 meeting, Todd took over the task of handing out work assignments to ensure duties were being evenly distributed. (Todd Aff. ¶6). Todd also offered to let Garrison take over a mail route in an effort to get him out of the warehouse and away from warehouse type work. (Garrison Depo. p. 123 at lines 15-23, p. 124 at lines 6-13; Todd Aff. ¶7). Garrison does not believe Todd ever spoke to him in a demoralizing manner or did anything to him. (Garrison Depo. p. 97 at lines 17-19, p. 107 at lines 14-20).

## 6.    NONRENEWAL

Finally, Garrison claims that he was eventually terminated because of his race. (*Complaint* ¶24). Garrison concedes that he was a probationary employee for three years from the date of his April 2002 hire. (Garrison Depo. p. 26 at lines 17-23). He also concedes that the Board could nonrenew him without giving him a reason (as long as the reason was non-discriminatory) during his three year probationary term. (Garrison Depo. p. 27 at lines 1-16). Garrison admits that he received evaluations from Todd as well as Dotson which expressed concern regarding his ability to get along with coworkers (among other things). (Garrison Depo. p. 31 at lines 1-4, p. 144 at line 16-p. 146 at line 21, p. 147 at line 6-p. 148 at line 6, p. 151 at lines 8-22; See Exhibit "11"-April 2003 Support Staff Evaluation; See Exhibit "12"-January 2004 Support Staff Evaluation; See Exhibit "13"-May 2004 Support Staff Evaluation). He further admits being aware that a black coworker and white coworker from the mailroom complained to Casillas that Garrison was not a team player. (Garrison Depo. p. 123 at lines 5-13, p. 127 at line 4-p. 128 at line 9). The same black coworker who complained to Casillas made the same complaint in Garrison's presence during a meeting.

13

(Garrison Depo. p. 131 at line 4-p. 132 at line 12). He also admits to having problems with other black coworkers, such as Tommie Williams, whom Garrison believes embarrassed him at a doctor's office because Williams could not figure out how to put a desk together and used slang words. (Garrison Depo. p. 136 at line 13-p. 139 at line 9). Garrison believes that Williams told someone that he could not work with Garrison. (Garrison Depo. p. 139 at lines 3-21). Almost immediately after placing Garrison on a mail route, Todd began receiving complaints from both mailroom workers and school secretaries about Garrison. (Todd Aff. ¶7). Garrison concedes that it is important for coworkers to get along. (Garrison Depo. p. 171 at lines 13-16).

Strength did not have any decisionmaking authority with respect to Garrison's nonrenewal. (Todd Aff. ¶8). Todd made the decision to recommend Garrison's nonrenewal based on his performance and personality problems and not on his race. (Id.) Strength did not have any input into Todd's decision to suggest Garrison's nonrenewal. (Id.) Garrison believes Strength "had something to do with it", but has no evidence to support that belief. (Garrison Depo. p. 155 at lines 10). That recommendation was forwarded to then Superintendent Clinton Carter who made the final recommendation to the Board, who upheld the Superintendent's recommendation. (Garrison Depo. p. 155 at lines 11-23). Garrison was notified of the Board's decision to nonrenew him by hand delivered letter dated June 25, 2004, but someone arranged for him to be paid for a few weeks after his nonrenewal. (Garrison Depo. p. 156 at line 15-p. 157 at line 4; See Exhibit "14"-June 25, 2004 Nonrenewal Letter). He was never told that he was being nonrenewed because of his race or because of any complaints he made. (Garrison Depo. p. 157 at lines 7-13). Garrison has no evidence to support his belief that he was nonrenewed based on his race. (Garrison Depo. p. 157 at line 14-p. 159 at line 1). Garrison was replaced by Lisa M. Brown, a black female. (See Exhibit "15"-August 26, 2004 Board Minutes; Casillas Aff. ¶6).

### C.    GARRISON'S EEOC CHARGE

Following his nonrenewal on June 25, 2004, Garrison filed a Charge of Discrimination with the EEOC on June 29, 2004.[7]  Garrison filed an Amended Charge on November 18, 2004 alleging that he was assigned degrading tasks, that the Board failed to promote him and that he was terminated in retaliation for reporting discriminatory conduct.[8]  (See Exhibit "16"-EEOC Amended Charge of Discrimination). The EEOC sent Garrison a right to sue letter on March 7, 2005.  (See Exhibit "17"-Right to Sue Letter).  This lawsuit was timely filed on June 7, 2005.

## III.    ARGUMENTS AND CONCLUSIONS OF LAW

### A.    STANDARDS GOVERNING SUMMARY JUDGMENT

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and...the moving party is entitled to a judgment as a matter of law."  Rule 56(c), *Federal Rules of Civil Procedure*; See also *Hill v. Clifton*, 74 F.3d 1150, 1152 (11th Cir. 1996).  "The moving party bears the initial burden of informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact."  *Gonzalez v. Lee County Housing Authority*, 161 F.3d 1290, 1294 (11th Cir. 1998)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986).  That burden may be satisfied either by demonstrating that there is no evidence of a dispute of material fact or by demonstrating that the nonmoving party has failed to make a showing "sufficient to establish the existence of an element essential to the [nonmovant]'s case, and on

---

[7]Garrison does not have a copy of his original charge filed in June 29, 2004 and does not know what the difference is between that charge and the November 18, 2004 amended charge. (Garrison Depo. p. 19 at lines 2-12).

[8]While Garrison made both a race and retaliation claim in his Amended EEOC Charge, he did not assert a retaliation claim in his *Complaint*.  (Complaint ¶24).

which that party will bear the burden of proof at trial." See *Celotex*, supra, 477 U.S. at 322. It is well-settled that the Court, in passing on a motion for summary judgment, must view all evidence and resolve all reasonable inferences in favor of the nonmoving party. *Zipperer v. City of Fort Myers*, 41 F.3d 619, 622 (11th Cir. 1995).

Once the movant has met its burden under Rule 56(e) by showing that there are no genuine issues of material fact or that the nonmovant lacks an essential element, the burden then shifts to the nonmovant to show the existence of a genuine issue of material fact. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604,608 (11th Cir. 1991). In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Supreme Court noted further "[t]hat the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." In the event the nonmovant fails to advance sufficient evidence to support a jury finding for the nonmovant, the Court may properly grant summary judgment. Id. at 249-50.

**B.    OFFICIAL CAPACITY CLAIMS**

The individual Defendants Carlinda Purcell, Barker, Casillas, Todd and Strength are entitled to summary judgment for any claims brought against them in their official capacities. Since the Board has been sued as a Defendant, Garrison's claims against the individual Defendants in their official capacities are due to be dismissed as redundant. Suit against these Defendants is simply another way of bringing an action against an entity of which an officer is an agent. See *Kentucky v. Graham*, 473 U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)(quoting *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Accordingly. the claims brought against Purcell, Barker, Casillas, Todd and Strength are due to be dismissed as a matter of law.

16

## C.    TITLE VII ANALYSIS

In the instant case, Garrison asserts that he was denied a promotion because of his race, nonrenewed because of his race and otherwise subjected to a hostile work environment because of his race. *Title VII of the Civil Rights Act of 1964*, as amended, prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of the individual's race, color, religion, sex, or national origin." 42 U.S.C. §2000e-2000(a)(1)(as amended).  Garrison cannot establish a Title VII violation as to any of the claims he asserts.

### 1.    INDIVIDUAL CAPACITY CLAIMS FOR TITLE VII

As a preliminary matter, the Title VII claims against the individual Defendants in their individual capacities are due to be dismissed as a matter of law.  The Eleventh Circuit has treated the issue as follows:

> Individual capacity suits under Title VII are similarly inappropriate. The relief granted under Title VII is against the *employer*, not the individual employees whose actions would constitute a violation of the Act.  *See Clanton v. Orleans Parish School Bd.*, 549 F.2d 1084, 1099 and n. 19 (5th Cir. 1981) [footnote omitted]; *see also* 42 U.S.C. §2000e(b)(1988)(definition of "employer"); 42 U.S.C. §2000e-2(1988)(violation for "employer" to discriminate); 42 U.S.C. §2000e-5g(relief for violation of §2000e-2).  We think the proper method for a plaintiff to recover under Title VII is by suing the employer, either by naming the supervisory employees as agents of the employer or by naming the employer directly.

*Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991)(Emphasis in original).

Pursuant to *Busby*, supra, the individual capacity claims for Title VII violations against Barker, Todd, Casillas and Strength are inappropriate and are due to be dismissed as a matter of law.  See also *Hinson v. Clinch County, Ga. Bd. of Education*, 231 F.3d 821, 826 (11th Cir. 2000)(citing *Busby* for same proposition); *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1172 n. 17 (11th Cir. 2003)(citing *Busby* for same proposition); *Saville v. Houston County Healthcare*

*Authority*, 852 F.Supp. 1512, 1523 (M.D.Ala.1994)(noting that the *Busby* proposition remains good

law even after 1991 amendment); *Moss v. W & A Cleaners*, 111 F.Supp.2d 1181, 1186 (M.D.Ala.

2000)(<u>citing</u> *Busby* for same proposition)

### 2.   EXHAUSTION OF ADMINISTRATIVE REMEDIES

All but one of the claims Garrison asserts are time-barred by Title VII's statute of limitations.

A charge of discrimination is not filed solely as a technical preliminary matter to a lawsuit; rather,

the purpose of the charge of discrimination is to trigger the investigatory and conciliatory procedure

of the EEOC. <u>See</u> *Williamson v. International Paper Company*, 85 F.Supp.2d 1184, 1196 (S.D.Ala.

2000). Thus, an act of discrimination that is not brought in a timely charge is "legally equivalent

to a discriminatory act that occurred before the enactment of Title VII." <u>See</u> *Gonzales v. Firestone

Tire and Rubber Co.,* 610 F.2d 241, 249 (5th Cir. 1982). As a result, if the plaintiff fails to bring a

timely charge with the EEOC, he is procedurally barred from pursuing Title VII claims based on the

untimely conduct. *Smith v. McClammy*, 740 F.2d 925, 927 (11th Cir. 1984); *Wright v. Department

of Corrections*, 31 F.Supp.2d 1336, 1341 (M.D.Ala. 1998); *Zellars v. Liberty National Life Insurance

Co.*, 415 U.S. 36, 47, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1947); *Russ v. Buckeye Cellulose Corp.*, 980

F.2d 648 (11th Cir. 1993).

### a.   Timeliness of Discrete Acts

Garrison alleges certain discrete acts as a basis for his Title VII claim, including his hire, the

failure to promote him and his subsequent nonrenewal.

> In cases involving discrete retaliatory or discriminatory acts such as
> termination of employment, failure to promote, denial of transfer, or
> refusal to hire, a discrete retaliatory or discriminatory act occurs on
> the day that it happens. *Morgan,* [<u>infra</u>], 122 S.Ct. at 2070, 2073.
> "Each incident of discrimination and each retaliatory adverse
> employment decision constitutes a separate actionable 'unlawful
> employment practice.'" <u>Id.</u> at 2073. Consequently, "discrete
> discriminatory acts are not actionable if time barred, even when they
> are related to acts alleged in timely filed charges." <u>Id.</u> at 2072. Each
> such act starts a new clock for filing charges. <u>Id.</u>

*Thomas v. Alabama Council on Human Relations, Inc.*, 248 F.Supp.2d 1105, 1115 (M.D.Ala. 2003).

With the exception of his nonrenewal in June 2004, each incident which could possibly form the basis of a Title VII cause of action occurred either under Dotson's tenure which ended in July 2003 or prior to December 1, 2003 when Garrison wrote his letter to Barker. Garrison filed his original EEOC Charge on June 29, 2004. Any act that occurred more than 180 days prior to June 29, 2004 (January 1, 2004) is time barred by Title VII's statute of limitations.

To the extent Garrison attempts to assert a cause of action for being hired as a Laborer I, there is no dispute that such is a discrete act which occurred in April 2002. (Garrison Depo. p. 24 at lines 2-9; Appointment Letter). With respect to Garrison's claim that he was improperly reprimanded by Todd in front of other employees, while such does not constitute an adverse employment action, even if it did, it is undisputed that same occurred in August 2003.[9] (Garrison Depo. p. 37 at lines 3-15; August 12, 2003 Letter). With respect to the filling of the Laborer III position, such is a discrete act and there is no dispute that same occurred in November 2003. (Garrison Depo. p. 55 at line 17-p. 57 at line 20). <u>See</u> *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 2070, 153 L.Ed.2d 106 (2002). The only action that falls within the statute of limitations is Garrison's nonrenewal in June 2004. Accordingly, Defendants

---

[9]Garrison alleges that the August 2003 meeting constituted a reprimand:

> Verbal reprimands and threat of termination do not constitute adverse employment actions. <u>See</u> *Benningfield v. City of Houston*, 157 F.3d 369, 377 (5th Cir. 1998)(holding that verbal reprimands do not constitute adverse employment actions); *Nunez v. City of Los Angeles*, 147 F.3d 867, 875 (9th Cir. 1998)("Mere threats and harsh words are insufficient" to constitute an adverse employment action.); *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 708 (5th Cir.), cert denied, 522 U.S. 932 [...](holding that threats of discharge are not adverse employment actions).

*Mistretta v. Volusia County Dept. of Corrections,* 61 F.Supp.2d 1255, 1260-61 (M.D.Fla. 1999).

are entitled to summary judgment as to Garrison's claims regarding his hire and the Laborer III position.

**b.    Timeliness of Hostile Work Environment Claims**

Garrison also alleges certain hostile work environment claims primarily related to Strength.

Regarding Garrison's hostile work environment claims, the statute of limitations analysis is

different:

> A hostile work environment claim is composed of a series of
> separate acts that collectively constitute one "unlawful employment
> practice." 42 U.S.C. §2000e-5(e)(1). The timely filing provision only
> requires that a Title VII plaintiff file a charge within a certain number
> of days after the unlawful practice happened. It does not matter, for
> purposes of the statute, that some of the component acts of the
> hostile work environment fall outside the statutory time period.
> Provided that an act contributing to the claim occurs within the filing
> period, the entire time period of the hostile environment may be
> considered by a court for the purposes of determining liability.

*Morgan*, supra, 536 U.S. at 117.

Even under this more generous standard, Garrison's claims are still time barred. The

alleged incidents of hostile work environment harassment were so isolated and distant in time that

it is impossible for Garrison to argue the continuing violation doctrine, thereby maintaining a timely

charge regarding any of the incidents. See *Thomas*, supra, 248 F.Supp.2d at 1116. Regarding

Garrison's purported hostile work environment claims that he makes against Strength, there is no

dispute that each of these acts predated January 1, 2004. With respect to working in unsanitary

conditions at the elementary school, again to the extent that same could be considered an adverse

employment action, Garrison testified that Dotson was the Director when that occurred. (Garrison

Depo. p. 87 at lines 3-10). There is no dispute that Dotson was Director until July 2003. (June 11,

2003 Board Minutes). With respect to the allegedly "racist" remarks Strength made around

Garrison, he is clear that there were only two remarks and that both of them occurred when Dotson

was Director. (Garrison Depo. p. 74 at lines 2-22, p. 76 at lines 19-23, p. 105 at line 3-p. 106 at line

20). As to the "demoralizing" tasks Strength assigned to Garrison, to the extent same constitutes

any sort of adverse employment action, obviously predated Garrison's December 1, 2003 letter to Barker inasmuch as those complaints were contained in said letter.  (December 1, 2003 Letter). The undated incident wherein Strength allegedly propped his foot up close to Garrison's face during a meeting necessarily occurred before December 1, 2003.  (December 1, 2003 Letter). Lastly, with respect to Strength raising his voice at Garrison about recording computer serial numbers, that incident occurred on December 9, 2003. (December 11, 2003 Memo).  His claim that Strength attempted to entice him to steal garbage bags also occurred during Dotson's tenure. Garrison does not allege one single act which could possibly constitute a hostile work environment that post dated January 1, 2004. With respect to the hostile work environment claims, "the timely filing provision of Title VII only requires that a Title VII plaintiff file a charge within the specified number of days after 'an act contributing to the claim occurs.'" *Thomas,* supra, 248 F.Supp.2d at 1116 (*quoting Morgan*, supra, 122 S.Ct. at 2074. "[A] continuing violation does not occur simply because the employee continues to feel the effect of the discriminatory act that occurred outside the limitations period."  *Miller v. Bed, Bath & Beyond, Inc.*, 185 F.Supp. 2d 1253, 1263 (N.D.Ala. 2002)(citing *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 853 (11th Cir. 2000). Accordingly, all of his hostile work environment claims are barred by the statute of limitations and Defendants are entitled to summary judgment as to those claims.

### 3.    MERITS OF THE HOSTILE WORK ENVIRONMENT CLAIMS

Even if Garrison's Title VII hostile work environment claims were not time-barred, they would be due to be dismissed as a matter of law.  To establish a *prima facie* case of hostile work environment based on race, Garrison would have to show that:

(1)    [he] belongs to a protected group,
(2)    [he] has been subjected to unwelcome harassment,
(3)    the harassment was based on a protected characteristic of the employee,
(4)    the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create such a discriminatory abusive working environment, and

21

> (5)    the employer was responsible for such environment under
>         either a theory of vicarious or direct liability.

*Mosley v. Meristar Management Co.*, 137 Fed.Appx. 248, 252 (11th Cir. 2005)(<u>citing</u> *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

The only element Garrison can credibly establish is that he belongs to a protected group. Garrison cannot prove any of the other elements.  With respect to Barker, Casillas and Todd, Garrison testifies that he was treated with respect.  (Garrison Depo. p. 97 at lines 17-19, p. 107 at lines 14-20, p. 164 at lines 6-17). Garrison's hostile work environment claims all center around Strength.  However, Garrison has no evidence that any of the actions allegedly taken by Strength were based on his race.

Garrison alleges that he was made to engage in degrading and demoralizing tasks by Strength such as cutting grass, washing cars and picking up paper, as well as removing computers from a school with a sewage problem.  Garrison was a Laborer I.  While assignment of such duties may be inappropriate to assign to a teacher or principal, there is no evidence that such would be inappropriate to assign to an entry level laborer or that such is related in anyway to race.

He also makes allegations regarding two "racial statements" made by Strength, both of which occurred sometime prior to July 2003 when Dotson was still director.  Garrison alleges that Strength referred to a black employee as a "monkey" when addressing another employee and used the term "all you-all" when referring to a group of black employees of which he was a part. Garrison confirms that these are the only two statements made by Strength which he considered racist and that no other Defendant made such statements.  (Garrison Depo. p. 103 at line 23-p. 104 at line 5).  Use of the term "you-all" cannot credibly be seen as relating to race.  While use of the term "monkey", if true, could be considered racist, one such incident in two years and not directed at Garrison cannot be deemed so severe and pervasive as to alter Garrison's working conditions:

> Four factors that should be considered in determining whether
> harassment objectively altered an employee's terms of conditions of
> employment [are]:

22

(1)  the frequency of the conduct;
(2)  the severity of the conduct;
(3)  whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and
(4)  whether the conduct unreasonably interferes with the employee's job performance.

*Gullatte v. Westpoint Stevens, Inc.*, 100 F.Supp.2d 1315, 1322 (M.D.Ala. 2000)(citing *Mendoza v. Borden*, 195 F.3d 1238, 1245 (11th Cir. 1999).

"The test for determining whether harassing conduct is sufficiently severe or pervasive incorporates both a subjective and objective component. " *Mendoza*, supra, 195 F.3d at 1246). The simple utterance of an epithet that creates offensive feelings in an employee does not implicate Title VII. See *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). "[I]solated general racial comments 'are not *direct* evidence of discrimination because they are either too remote in time or too attenuated because they were not directed at the plaintiff[,]" *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1291 (11th Cir. 1998). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Baker v. Alabama Department of Public Safety*, 296 F.Supp.2d 1299, 1309-10 (M.D.Ala. 2003)(quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662) (1998). Further, Title VII is used to address discrimination, not "harsh treatment at the workplace." *Nix v.* WLCY *Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984).

Garrison relates other incidents relating to Strength's demeanor, including Strength propping his foot up in a meeting disrespectfully, Strength enticing Garrison to steal garbage bags and Strength directing or demanding Garrison to record serial numbers off of a computer. None of these incidents carry a racial indicia and were not so severe and pervasive as to alter Garrison's working conditions.

Not only did none of these actions rise to the level of hostile work environment, when Garrison complained, the Defendants attempted to take corrective action: Barker convened a

meeting with Garrison, his representative, Todd and Casillas to address the problems, Casillas investigated Garrison's claims regarding Strength's treatment, Todd took over distribution of work orders from Strength to ensure that work was being distributed evenly and Todd moved Garrison to a more responsible, less plebeian position by taking him out of the warehouse and placing him in charge of a mail route. Accordingly, assuming Garrison's hostile work environment claim was not time-barred, Garrison could not establish a *prima facie* case of race discrimination, nor could he establish pretext.

### 4.  DENIAL OF PROMOTION

Garrison alleges that the Defendants failed to promote him to a Laborer III position in November 2003 on the basis of his race. Said action falls outside of the applicable statute of limitations and therefore the Defendants are entitled to judgment as a matter of law regarding this action. That being said, even if the promotion was actionable, Defendants would still be entitled to judgment as to this claim.

In order to support his Title VII claim, Garrison must establish that the failure to promote him was the result of intentional discrimination. *Merriweather v. Alabama Dept. of Public Safety*, 17 F.Supp.2d 1260, 1267 (M.D.Ala. 1998)(citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Garrison may prove intentional discrimination through either direct or circumstantial evidence. See *Shuford v. Alabama State Bd. of Educ.*, 978 F.Supp. 1008, 1015 (M.D.Ala. 1997).

In order to show intentional discrimination through direct evidence, Garrison must present evidence that "is sufficient to prove discrimination without inference or presumption. Only the most blatant remarks whose intent could be nothing other than to discriminate constitute direct evidence." *Clark v. Coates & Clark, Inc.*, 990 F.2d 1217, 1223 (11th Cir. 1993). Garrison offers no direct evidence of race discrimination. He simply states that Causey was white. It is insufficient

24

to simply argue that the person hired was white.  See *Geer v. Marco Warehousing, Inc.*, 179 F.Supp.2d 1332, 1341 (M.D. Ala. 2001).

In the absence of direct evidence, Garrison must prove his claim by use of circumstantial evidence through a framework of shifting burdens of proof and production as contemplated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d. 668 (1973).  To prove discriminatory treatment through circumstantial evidence, Garrison must first make out a *prima facie* case of discrimination. Id. at 802.  If he fails to establish a *prima facie* case of discrimination, summary judgment is due to be granted.  If a *prima facie* case is established, the burden shifts to the defendant to produce legitimate, non-discriminatory reasons for the alleged adverse employment action. Id.  When legitimate, non-discriminatory reasons are proffered, the burden then shifts back to the plaintiff to establish that those reasons are pretextual. Id at 802-804. The plaintiff has the "ultimate burden of proving the reason to be pretextual". *Holifield v. Reno,* 115 F.3d 1555, 1565 (11th Cir. 1997).  If the plaintiff fails to produce evidence sufficient to permit a reasonable factfinder to disbelieve the defendant's proffered non-discriminatory reasons, summary judgment should be granted.  *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1233, 1230 (11th Cir. 2002).

### a.    *Prima Facie* **Case**

To establish a *prima facie* case for failure to promote, Garrison must show the following:

1)    [he] belonged to a protected group;
2)    [he] applied and was qualified for a job for which [his] employer was seeking applications;
3)    despite [his] qualifications, [he] was rejected for the position; and
4)    after [he] was rejected, [his] employer kept the position open or filled it with a person who is not a member of plaintiff's protected group.

See *Norrell v. Waste Away Group, Inc*, 246 F.Supp.2d 1213, 1221 (M.D.Ala. 2003)(citing *Walker v. Mortham*, 158 F.3d 1177, 1193 (11th Cir. 1998).

For purposes of summary judgment, Defendants concede that Garrison can establish a *prima facie* case. However, Defendants contend that it had a legitimate, non-discriminatory reason for selecting Causey over Garrison for the subject position.

### b.    Legitimate, Non-discriminatory reason

Garrison admits in his deposition that the person hired for the subject Laborer III position would be responsible for handling science kits. (Garrison Depo. p. 56 at lines 5-15, p. 57 at lines 8-11). Laborer II Causey, the candidate selected, was the employee already mainly working with science kits and was qualified for the position.[10]

Even if Garrison was more qualified for the position than Causey, which he cannot establish, such a showing would still be insufficient to establish pretext. The applicable standard was quoted in *Denney v. City of Albany*, 247 F.3d 1172, 1187 (11th Cir. 2001) where a group of white firefighters passed over for promotions by black firefighters claimed they were better qualified:

> In a failure to promote case, a plaintiff cannot prove pretext by simply showing that she was better qualified than the individual who received the position that she wanted... "[D]isparities in qualifications are not enough in and of themselves to demonstrate discriminatory intent unless those disparities are so apparent as virtually to jump off the page and slap you in the face."

Id. (quoting *Lee v. GTE Fla., Inc.*, 226 F.3d 1249, 1253-54 (11th Cir. 2000)); see also *Walker v. Prudential Property and Cas. Ins. Co.*, 286 F.3d 1270, 1277 (11th Cir. 2002).

In fact, Garrison does not argue that Causey was unqualified. (Garrison Depo. p. 154 at lines 17-21). He simply argues that he was more qualified. Despite Garrison's opinion that he was better qualified than the candidate selected, he cannot meet this *Lee* standard of disparity. As noted in *Denney*, supra, 247 F.3d at 1188, "[the courts] do not ask whether the employer selected

---

[10]As previously stated, Plaintiff makes this exact statement in his *Complaint*, but seeks to retract it when confronted with that fact in his deposition.

the 'most' qualified candidate, but only whether it selected the candidate based on an unlawful motive."

Because the Defendants need only produce, not prove, the non-discriminatory reason, the burden is "exceedingly light". *Perryman v. Johnson Products Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983); *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994). There is no evidence to contradict the legitimate, non-discriminatory reason that has been proffered by the Defendants for the employment decision made regarding this position. See *Chapman v. AI Transport*, 229 F.3d 1012, 1037 (11th Cir. 2000).

The Superintendent followed the recommendation of the interview committee to make his recommendation to the Board. There is no absolutely no evidence that anyone discriminated against Garrison because of his race and the decision was based on the legitimate, non-discriminatory reason that the person hired was already working in the area of need.

Inasmuch as the Defendants have eliminated any presumption of race discrimination, the Defendants are entitled to summary judgment as to these claims unless Garrison can establish pretext. See *Chapman,* supra, 229 F.3d at 1024, 1037(requiring plaintiff to establish pretext as to each of employer's legitimate non-discriminatory reasons); see also *Cooper v. Southern Co.*, 390 F.3d 695, 730 (11th Cir. 2004)(holding "even if [employee] could discredit one of the reasons [employer] offered for not hiring him, it would still not establish pretext, because to do so, [employee] would have to establish that *each* of [employer's] reasons was pretextual.").

### 5.    NONRENEWAL

#### a.    Establishment of *Prima Facie* Case

Finally, Garrison alleges a cause of action for race discrimination based on his nonrenewal. Again, Garrison has no direct evidence whatsoever that his nonrenewal was based on his race. Accordingly, he must use the aforementioned *McDonnell Douglas* standard to establish a *prima facie* case of race discrimination showing that:

(1)    the plaintiff is a member of a protected class;

(2)    the plaintiff was qualified for the position at issue;

(3)    the plaintiff was discharged despite his qualifications; and

(4)    the plaintiff was subjected to differential treatment, that is, he was either (a) replaced by someone who was not a member of the plaintiff's protected class or (b) similarly situated employee who was not a member of the protected class engaged in nearly identical conduct and was not discharged.

*Davis v. Qualico Miscellaneous, Inc.*, 161 F.Supp.2d 1314, 1319 (M.D.Ala. 2001).

Here, Garrison does not plead, present evidence or argue that he was replaced by someone not a member of his protected class, nor does he argue that a similarly situated white employee engaged in nearly identical conduct and was not discharged. In fact, Garrison was replaced by a black female, Lisa Brown. (August 26, 2004 Board Minutes). Accordingly, it is impossible for Garrison to maintain a *prima facie* case of race discrimination regarding his termination.

### b.    Legitimate, Non-discriminatory Reasons

Even assuming that Garrison could establish a *prima facie* case for his nonrenewal, Defendants had a legitimate, non-discriminatory reason for his nonrenewal. It is undisputed that state law permits nonrenewal of probationary employees for any reason that is not discriminatory or otherwise illegal. (Garrison Depo. p. 27 at lines 1-16). Defendants have presented evidence that Garrison could not get along with his coworkers, both black and white. Both Todd and Casillas received complaints that Garrison was too difficult to work with, from both black and white employees. (Casillas Aff. ¶7; Todd Aff. ¶7; April 2003 Support Staff Evaluation; January 2004 Support Staff Evaluation; May 2004 Support Staff Evaluation). In addition to the repeated performance evaluations noting this concern--by both the black director and the white director–while not admitting that he had difficulty getting along with coworkers, Garrison admitted that he got into conflicts with other black employees, if only through anecdotal evidence. (Garrison Depo. p. 42 at lines 1-13, p. 136 at line 13-p. 139 at line 21). He further admits that the ability to

get along with coworkers is an important part of a job. (Garrison Depo. p. 171 at lines 13-16). Further, he had a poor attitude when it came to performing his duties. Garrison wanted to determine what work was necessary and what was not. He boldly testified that rather than perform the cleaning duties assigned around the warehouse when work was slow, that he would rather go home because such duties were not necessary. (Garrison Depo. p. 91 at lines 1-8). None of these factors relate to his race.

Inability to get along with coworkers has been recognized as an essential function of any position and legitimate, non-discriminatory reason for terminating employment. See *McShane v. U.S. Attorney General*, 144 Fed.Appx. 779, 792 (11th Cir. 2005)(recognizing inability to get along with coworkers as valid legitimate, non-discriminatory reason for termination)(citing *Williams v. Motorola, Inc.*, 303 F.3d 1284, 1291 (11th Cir. 2002); See also *Vessels v. Atlanta Independent School System*, 408 F.3d 736, 770 (11th Cir. 2005)(holding that plaintiff's negative focus on the department's problems as opposed to creating strategies for change was a legitimate ,non-discriminatory reason for adverse employment action.); *Ritter v. Harvey*, 2005 WL 1868734 *5-6 (M.D.Ala.)(quoting *Garcia-Cabrera v. Cohen*, 81 F.Supp.2d 1272, 1280-81 (M.D.Ala. 2000)(holding that "[I]t is beyond question that an inability to get along with co-workers and demonstrated caustic or rude behavior is a legitimate, non-discriminatory reason for an employment decision." "If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir. 2004). While Garrison may disagree with his supervisors and coworkers' assessments of his personality traits, such is irrelevant. See *Cooper v. Diversicare Mgmt. Servs. Co.,* 115 F.Supp.2d 1311, 1318-10 (M.D. Ala. 1999):

> Evidence showing a false factual predicate underlying the employer's proffered reason does not unequivocally prove that the employer did not rely on the reason in making the employment decision. Instead, it may merely indicate that the employer, acting in good faith, made the disputed employment decision on the basis of

> erroneous information. It is obviously not a violation of federal
> employment discrimination laws for an employer to err in assessing
> the performance of an employee. Thus, establishing pretext is not
> merely demonstrating that the employer made a mistake, but that
> the employer did not give an honest account of its behavior.

(Id.)

Additionally, Title VII does not "require the employer to have good cause for its decisions. The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix, supra,* 738 F.2d at 1187.

Given Defendants' proffer of legitimate, non-discriminatory reasons for nonrenewing Garrison and Garrison's inability to demonstrate pretext, Defendants are entitled to summary judgment with respect to Garrison's claim that he was nonrenewed because of his race.

### D.  SECTION 1983

In the instant case, Garrison attempts to bring a separate §1983 cause of action against some or all of the Defendants.[11]   To the extent Garrison's §1983 claim is based upon his Title VII cause of action, Garrison's §1983 claim is inappropriate.   "[A]n allegation of a Title VII violation cannot provide the sole basis for a §1983 claim. [A] plaintiff cannot bootstrap an untimely Title VII claim by bringing a §1983 action based on a statutory violation of Title VII." *Goldstein v. City of Sunrise*, 143 Fed.Appx. 295 (11th Cir. 2005).  Even if Garrison's §1983 claim was properly asserted, the evidence is analyzed under the same framework as Title VII above.  See *Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985).  To the extent Garrison's §1983 claim is based upon some constitutional violation, Garrison fails to allege a specific constitutional violation.  *Heine v. Rice,* 2001 WL 1338780 *8 (M.D.Fla.)("[T]o assert any claim under §1983, the plaintiff must identify the

---

[11]Garrison's *Complaint* lists Count Two as "42 U.S.C. SECTION 1983 AGAINST INDIVIDUAL DEFENDANTS".  The Complaint goes on to accuse Barker, Todd, Strength, Casillas of implementing and executing unspecified unconstitutional policies and customs, "which knowledge is imputed to [the Board] and Carlinda Purcell."  (*Complaint* ¶29).

specific constitutional right that has been infringed.")(citing *Singer v. Fulton County Sheriff,* 63 F.3d 110, 115-16 (2d Cir. 1995), cert denied, 517 U.S. 1189 (1996). Additionally, §1983 cases implicate a "heightened pleading" standard. "Heightened pleading is the law of the circuit when §1983 claims are asserted against government officials." *Laurie v. Alabama Court of Criminal Appeals*, 256 F.3d 1266 (11th Cir.2001)(quoting *GJR Investments, Inc. v. County of Escambia, Fla.*, 132 F.3d 1359, 1367 (11th Cir. 1998)(holding that no equal protection claim stated in §1983 case where "the words 'equal protection' do not appear anywhere in the complaint."). That being said, assuming that Garrison's intent was to allege an §1983 claim pursuant to an equal protection violation against some or all of the Defendants, such liability cannot be maintained against any of the Defendants.

Section 1983 provides a remedy for deprivation of federally protected rights caused by persons acting under the color of state law. *Almand v. DeKalb County*, 103 F.3d 1510, 1512 (11th Cir. 1997). Local governmental bodies such as school boards are "persons" within the meaning of §1983. See *Monell*, supra, 436 U.S. at 690-91. While Garrison lists his §1983 cause of action as a separate count, "[s]ection 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994)(quoting *Baker v. McCollan*, 443 U.S. 137, 144, n.3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). Garrison must prove that a state actor deprived him of a right conferred by a federal statute or by the Constitution. See *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1313 (11th Cir. 2001). "A §1983 complainant must support her claim with specific facts demonstrating a constitutional deprivation and may not simply rely on conclusory allegations." *Bluitt v. Houston Independent School Dist.*, 236 F.Supp.2d 703, 719 (S.D.Tex. 2002)(citing *Schultea v. Wood*, 47 F.3d 1427, 1433 (5th Cir. 1995); *Fee v. Herndon*, 900 F.2d 804, 807 (5th Cir.), cert. denied, 498 U.S. 908, 111 S.Ct. 279, 112 L.Ed.2d 233 (1990); *Jacquez v. Procunier*, 801 F.2d 789, 793 (5th Cir. 1986); *Angel v. City of Fairfield*, 793 F.2d 737, 739 (5th Cir. 1986); *Elliott v. Perez*, 751 F.2d 1472, 1482 (5th Cir. 1985).

Despite Garrison's pronouncement that the actions of the individual defendants are "imputed to [the Board] and [Superindent]", a local governmental body such as the Board, cannot be found liable under §1983 on a *respondeat superior* theory. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 828, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). The Board is only liable for its own acts, not for the acts of its employees. See *Monell*, supra, 436 U.S. at 691-94. "Local governments are directly liable under §1983...for constitutional deprivations resulting from (1) an unconstitutional action taken pursuant to an officially promulgated policy statement, decision, regulation or ordinance; or (2) governmental custom, even though not authorized by written law." *Martinez v. City of Opa-Locka, Fla.*, 971 F.2d 708, 713 (11th Cir.1992) (citing *Monell*, supra, 436 U.S. at 690-91). Garrison must prove that an official policy or custom of the Board was a "moving force" behind the alleged constitutional deprivation. See *Farred v. Hicks*, 915 F.2d 1530, 1532-33 (11th Cir. 1990). Further, "each and any policy which allegedly caused constitutional violations must be specifically identified by a plaintiff." Quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir.), cert denied, 534 U.S. 820 (2001)(following *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 407, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)); See also *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998)(also following *Brown*, supra, 520 U.S. at 407).

To establish a violation by policy, Garrison must demonstrate that a decisionmaker with final policymaking authority violated his federally protected rights. In this case and pursuant to state statute, the Board constitutes the only entity with final policymaking authority. Garrison has not and cannot identify a policy of the Board which was the moving force behind any alleged violation of his federally protected rights.

Absent a policy, Garrison must demonstrate that the Board had a "longstanding and widespread" custom of nonrenewing or otherwise discriminating against employees on the basis of race. See *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991); See also *Monell*, supra, 436 U.S. at 694. Garrison presents no evidence of any such custom.

32

The third instance in which a Board can be held liable pursuant to §1983 is if a decision was made by an official who possesses "final authority to establish municipal policy with respect to the action ordered." *Hamilton v. Montgomery County Bd. of Educ.*, 122 F.Supp.2d 1273, 1289 (M.D. Ala. 2000) (citing *Brown, supra,* 923 F.2d at 1480). However, the Eleventh Circuit has held that §1983 liability cannot be established based on a subordinate official's decisions if the final policymaking body had the right to exercise its own discretion. *Scala v. City of Winter Park*, 116 F.3d 1396, 1399 (11th Cir. 1997). Additionally, where the Board has adopted a policy, any alleged deviation from that policy by an employee of the Board does not represent policy of the Board. See *Thomas ex rel. Thomas v. Roberts*, 261 F.3d 1160, 1173 (11th Cir. 2001), vacated on other grounds, 536 U.S. 953 (2002). Under Alabama law, the Board has final decisionmaking authority with respect to employment actions. "The superintendent has no power to dismiss; he may only recommend dismissal to the board of education." *Marsh v. Birmingham Bd. of Educ.*., 349 So.2d 34 (Ala. 1977). Neither Barker, Casillas, Todd nor Strength possess any authority whatsoever to effect the termination or nonrenewal of any employee.

None of the Defendants committed any act against Garrison that violated his constitutional. There is no question of fact regarding an underlying constitutional violation. Regardless, Garrison cannot point to and does not identify any policy or custom of the Board that caused some violation (assuming any violation could be established) and Garrison cannot establish a custom of terminating or otherwise discriminating against Black employees that is so permanent and well-settled with the Board that it has the force and effect of law. Accordingly, the Defendants are entitled to summary judgment on Garrison's §1983 claim.

### 1. QUALIFIED IMMUNITY FOR INDIVIDUAL CAPACITY CLAIMS

Assuming Garrison's §1983 claim is properly asserted, the individual Defendants would be entitled to qualified immunity for claims brought against them in their individual capacities. Qualified immunity is designed to protect and "allow government officials to carry out their

discretionary duties without the fear of personal liability or harassing litigation." Quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)(citing *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987)). Once the defendants raise qualified immunity as a defense, the burden shifts to the plaintiff to demonstrate that qualified immunity is not appropriate. *Ferraro*, supra, 284 F.3d at 1194. Qualified immunity protects the Defendants from Plaintiff's damages claims in their individual capacities if they can establish that they acted within their discretionary authority in a manner that violated no "clearly established statutory or constitutional rights of which a reasonable person would have known" (or in "good faith"). *Nolin v. Isbell*, 207 F.3d 1253, 1255 (11th Cir. 2000)(citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Therefore, the first question to be answered by the Court is whether Defendants were "acting within the scope of [their] discretionary authority when the alleged wrongful acts occurred." *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991)(quoting *Rich v. Dollar*, 841 F.2d 1558, 1563 (11th Cir. 1988)).

### a.    Discretionary Acts

Officials act within the scope of their discretionary authority when "[their] actions were undertaken pursuant to the performance of [their] duties and within the scope of [their] authority." *Rich*, supra, 841 F.2d at 1564 (internal citations omitted). There can be no dispute that the acts of which Garrison complains were in fact discretionary acts taken within the Defendants' authority.

Barker, as Assistant Superintendent for Human Resources, acted within the scope of his authority and used his discretion when he received and acted on the complaints that Garrison raised. In fact, Garrison clearly articulates that Barker met with him and his union representative, listened to what he had to say, expressed his desire that Garrison be treated fairly, convened a corrective meeting and took action to resolve any problems Garrison thought he had. (Garrison Depo. p. 69 at lines 3-21, p. 71 at lines 1-6, p. 116 at lines 7-23, p. 118 at line 17-p. 119 at line 12, p. 120 at line 2-p. 121 at line 6). During his testimony, Garrison retracts his prior claim that Barker

lied to him or broke a promise to him.  (Garrison Depo. p. 162 at line 7-p. 164 at line 1).  Likewise, Casillas was never rude or disrespectful to Garrison, participated in the January 2004 meeting to discuss Garrison's complaints and conducted an extensive investigation into Garrison's allegations. (Casillas Aff. ¶7; Garrison Depo. p. 118 at line 17-p. 119 at line 12, p. 164 at lines 6-17).  All of the actions taken by him were appropriate and in the scope of his authority as a Support Personnel Specialist.  Todd attempted to limit conflicts in the department by holding the August 2003 meeting, participated in the January 2004 meeting, took over assignment of staff duties and subsequently moved Garrison to another position in an attempt to address his concerns regarding his work duties.  (Todd Aff. ¶¶6-7; Garrison Depo. p. 43 at lines 9-17, p. 123 at lines 15-23, p. 124 at lines 6-13). Todd made the decision to recommend Garrison's nonrenewal to then Superintendent Carter based on his assessment of Garrison's ability to work with other employees in the department. (Todd. Aff. ¶8). All of these actions were done in the scope of his authority as Director of Logistics. Strength's assignment of various tasks to Garrison were done in the scope of his employment as a supervisor in Logistics. (Garrison Depo. p. 79 at line 11-p. 80 at line 7).  All of the actions taken by the individual Defendants required them to use their discretion in determining the best method of addressing the matters presented.  Accordingly, each of the individual Defendants were acting within their discretionary authority.

### b.    Two-Part Qualified Immunity Analysis

Once the individual Defendants have established that they were acting within their discretionary authority, the burden shifts to Garrison to establish that qualified immunity is not appropriate. See *Vinyard v. Wilson*, 311 F.3d 1340, 1346-47 (11th Cir. 2002) (citing *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)). The Supreme Court has established a two-part analysis for qualified immunity.  First, the Court must determine whether the plaintiff's allegations, if true, establish a constitutional violation. Id. If it is established that a constitutional right would have been violated under the plaintiff's version of the facts, the court must determine

whether the constitutional right asserted was clearly established. See *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Ferraro*, supra, 284 F.3d at 1194. In order to show that the law was clearly established, "the right must be so specific that 'in the light of pre-existing law the unlawfulness must be apparent.'" *Gorman v. Roberts*, 909 F.Supp. 1493, 1504 (M.D. Ala. 1995).

### 1.    No Violation of Constitutional Right

The Court must first determine whether Garrison's allegations, if true, establish a violation of a constitutional right. Garrison has no evidence, outside of his own conjecture, that his lack of promotion, nonrenewal or any of the other sundry complaints he makes were based on his race. For the same reasons discussed in the Title VII section of this brief, Garrison cannot establish that any of the actions taken were in violation of a constitutional right.

### 2.    Not a Violation of Clearly Established Law

While Defendants concede that it is clearly established that they cannot discriminate against an employee on the basis of his race, Garrison has not established a constitutional violation with respect to any of the allegations he has raised. "[W]ithout a constitutional violation, there can be no violation of a clearly established constitutional right." *Gorman*, supra, 909 F.Supp. at 1505 (quoting *Burrell v. Board of Trustees of Ga. Military* College, 970 F.2d 785, 791 (11th Cir. 1992))(citing *Oladeinde v. City of Birmingham*, 963 F.2d 1481, 1485 (11th Cir. 1992)).

Accordingly, there is no clearly established violation of a constitutional right. Even assuming that Garrison could establish some timely and appropriately asserted constitutional violation, it was not clearly established that any of the actions taken by any of the Defendants, including even Strength, were violative of the constitution. It was certainly not clearly established that Strength could not distribute work orders to his subordinate. It was not clearly established that Todd could not attempt to rectify complaints among coworkers within his own department, move Garrison into a new position with his permission and failing all of those attempts, suggest Garrison's nonrenewal

to then Superintendent Carter.  It was not clearly established that Barker and Casillas could not attempt to rectify and investigate Garrison's complaints.  Accordingly, the individual Defendants are entitled to qualified immunity in their individual capacities.

### D.    STATE LAW CLAIM-WANTONNESS

Garrison alleges the state law claim of wantonness against Defendants.

#### 1.    SOVEREIGN IMMUNITY

Under Alabama law, the Board is entitled to sovereign immunity with regard to any state law tort claims.  In *Palmer v. Perry County Bd. of Educ.*, 496 So.2d 2, 5 (Ala. 1986), the Alabama Supreme Court addressed the issue of whether a county school board was immune from suit with regard to tort actions based on the doctrine of sovereign immunity.  The Court held that it was well established that county boards of education are arms of the state and therefore partake of the state's immunity from suit with regard to tort actions.  The *Palmer* decision was consistent with and based upon the long line of Alabama Supreme Court decisions which held that county boards of education were immune from suit on tort actions.  See *Hutt v. Etowah County Bd. of Educ.*, 454 So.2d 973, 974 (Ala. 1984); *Enterprise County Bd. of Educ. v. Miller*, 348 So.2d 782, 784 (Ala. 1977); *Sims v. Etowah County Bd. of Educ.*, 337 So.2d 1310 (Ala. 1976).  In the instant case, the Board and individual Defendants sued in their official capacities are entitled to summary judgment as to the Plaintiff's claims of wantonness.  See *Belcher v. Jefferson County Bd. of Educ.*, 474 So.2d 1063, 1065 (Ala. 1995); *Hutt*, supra, 454 So.2d  at 974; See also *Hickman v. Dothan City Bd. of Educ.*, 421 So.2d 1257, 1259 (Ala. 1992)(holding that employees sued in their representative capacities are entitled to sovereign immunity). Accordingly, the Board and individual Defendants in their official capacities are entitled to judgment as a matter of law as to the wantoness claims brought against them.

37

## 2. DISCRETIONARY FUNCTION IMMUNITY

In addition to sovereign immunity, the individual Defendants are entitled to discretionary function immunity for the state law claims asserted against them in their individual capacities. Discretionary function immunity protects board of education employees from claims involving negligence or wantonness. *L.S.B. v. Howard*, 659 So.2d 43, 44 (Ala. 1995). The issue of whether a defendant is engaged in a discretionary function and is therefore immune from tort liability is a question of law to be decided by the trial court. *Grant v. Davis*, 537 So.2d 7, 8 (Ala. 1988); See also *Louviere v. Mobile County Bd. of Educ.*, 670 So.2d 873, 877 (Ala. 1995). The Court must decide whether the Defendants were engaged in ministerial acts or discretionary acts. The Alabama Supreme Court explained the distinction:

> "[M]inisterial acts" [are] those involving "[l]ess in the way of personal decision or judgment or [in which] the matter for which judgment is required has little bearing of importance upon the validity of the act"..."[M]inisterial acts are those done by officers and employees who are required to carry out the orders of others or to administer the law with little choice as to when, where, how, or under what circumstances their acts are to be done". Conversely, "discretionary acts" are defined as follows by Black's Law Dictionary 419 (5th Ed. 1979): "Those acts [as to which] there is no hard and fast rule as to course of conduct that one must or must not take and, if there is a clearly defined rule, such would eliminate discretion...One which requires exercise in judgment and choice and involves what is just and proper under the circumstances."

*Nance v. Matthews*, 622 So.2d 297, 300 (Ala. 1993)(citing *Smith v. Arnold*, 564 So.2d 873, 876 (Ala. 1990))(Internal citations omitted)(Emphasis in original).

The Alabama Supreme Court affirmed the doctrine of discretionary function immunity in *Ex parte Cranman*, 792 So.2d 392, 405 (Ala. 2000). In *Cranman*, the Court stated as follows:

> We therefore restate the rules governing state agent immunity: A State agent *shall* be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's (1) formulating plans, policies, or designs; or (2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as: (a) making administrative adjudications; (b) allocating resources; (c) negotiating contracts; (d) hiring, firing,

38

> transferring, assigning, or supervising personnel; or (3) discharging duties imposed on a department or agency by statute, rule, or regulation...; or (4) exercising judgment in the enforcement of the criminal laws of the State, ...; or (5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.

*Cranman*, supra, 792 So.2d at 405.

All of the decisions made and actions taken by the Defendants involved using their discretion and judgment as discussed in the qualified immunity section. Under the authority of *Cranman* and successive cases, the individual Defendants are entitled to judgment as a matter of law on the wantonness cause of action made against them in their individual capacities.

### 3.    WANTONNESS

In his Complaint and deposition testimony, Garrison alleges that the Board, Barker and Casillas acted wantonly and improperly trained Strength. Wantonness is defined as "conduct which is carried on with a reckless or conscious disregard of the rights or safety of others." *Ala. Code* §6-11-20(b)(3). Garrison can present no evidence of wanton behavior by these Defendants or improper training. Further, the Defendants would be entitled to immunity from this claim and are entitled to judgment as a matter of law on this claim.

## IV.    CONCLUSION

For each of the actions Garrison challenges, the Defendants offered legitimate and non-discriminatory rationale for its decisions. Garrison offers nothing more than his own conjecture as evidence of race discrimination. "Bald conclusions, opinions and hearsay without supporting specific facts are not admissible and do not create a genuine issue of material fact to defeat summary judgment." *Williams v. Hager Hinge*, 916 F.Supp. 1163, 1168 (M.D. Ala. 1995)(citing *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985). Further, it is well-settled in the

Eleventh Circuit that statutes like Title VII are not intended to make federal courts into super-

personnel departments:

> Title VII is not designed to make federal courts "'sit as a super-personnel department that reexamines an entity's business decisions.'" *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1997)(stressing that "federal courts do not sit to second-guess the business judgment of employers"). Work assignment claims strike at the very heard of an employer's business judgment and expertise because they challenge an employer's ability to allocate its assets in response to shifting and competing market priority. The same concern exists for public entities such as the [police department], which must balance limited personnel resources with the wide variety of critically important and challenging tasks expected of them by the public.

*Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1244 (11th Cir. 2001); See also *Chapman,* supra, 229 F.3d at 1030; *Denney,* supra, 247 F.3d at 1188; *EEOC v. Total Sys. Services*, 221 F.3d 1171, 1176 (11th Cir. 2000); *Cofield v. Goldkist*, 267 F.3d 1264, 1269 (11th Cir. 2001).

Garrison cannot establish, either through direct or circumstantial evidence, that the actions

taken were based on illegal reasons of race discrimination.

Wherefore the premises having been considered, the Defendants respectfully request the

Court to grant the Defendants' Motion for Summary Judgment and dismiss the Plaintiff's claims as

a matter of law.

Respectfully Submitted this 14th day of December, 2005.

MONTGOMERY COUNTY BOARD OF EDUCATION, CARLINDA PURCELL, JIMMY BARKER, JACKY TODD, MIKE STRENGTH AND MARK CASILLAS, DEFENDANTS,

/s/ James R. Seale
James R. Seale (3617-E-68J)
Elizabeth Brannen Carter (3272-C-38E)
Jayne L. Harrell (6544-Y-85H)

OF COUNSEL:

HILL, HILL, CARTER, FRANCO,
    COLE & BLACK, P.C.
425 South Perry Street
Post Office Box 116
Montgomery, Alabama 36101-0116
(334) 834-7600 - phone
(334) 263-5969 - fax
jrs@hillhillcarter.com
ecarter@hillhillcarter.com
jharrell@hillhillcarter.com

## CERTIFICATE OF SERVICE

I hereby certify that I have electronically filed the foregoing *Memorandum Brief in Support of Defendants' Motion for Summary Judgment* with the Clerk of the Court for the United States District Court, for the Middle District of Alabama, Northern Division, using the CM/ECF system which will send notification of such filing to Juraldine Battle-Hodge (battleb@bellsouth.net) this the 14th day of December, 2005.

/s/ James R. Seale _____

41